1  Harry Eldridge H-06424
   Mule Creek State Prison
2  P.O. Box 409060, C-13-244-L
   Ione, CA 95640
3
                                    **FILED**

4                                  MAY 2 8 2008

5                            RICHARD W. WIEKING
                            CLERK, U.S. DISTRICT COURT
6                        NORTHERN DISTRICT OF CALIFORNIA

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                                      **1683**

11  HARRY ELDRIDGE,                Docket No. _____
              Petitioner,
12                                 NOTICE OF LODGMENT OF EXHIBITS

13        v.                                            **JSW**

    RICHARD SUBIA, (Warden)
14          Respondent.
                          /
15

16                                                     **(PR**

17        NOTICE TO ALL PARTIES:

18     Petitioner, Harry Eldridge, hereby serves notice that he has lodged

19  a separate volume of supporting exhibits in the above entitled court and

20  cause of action.

21  Dated: *5-22-08*              Respectfully submitted:

22

23                               Harry Eldridge, In Pro Se

24

25

26

27

Harry Eldridge H-06424
Mule Creek State Prison
P.O. Box 409060, C-13-244-L
Ione, CA 95640

In Pro Se


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


In re Eldridge                          Docket No. _____

                                        **VOLUME OF EXHIBITS**
                                        **OFFERED IN SUPPORT OF**
                                        **PETITION FOR WRIT OF**
                                        **HABEAS CORPUS**


From Judgment (Sentencing) rendered in the Superior Court

of the State of California for the County of Santa Clara

before Honorable Judge Robert M. Foley


                              _____
                              Harry Eldridge, In Pro Se

EXHIBIT "A"

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

**FILED**

MAR 12 2007

KIRI TORRE
Chief Executive Officer
Superior Court of the County of Santa Clara
BY _____
DEPUTY

In re                                          )          No. 142464
                                               )
Harry Eldridge                                 )          Order
                                               )
On Habeas Corpus                               )
_____)

Harry Eldridge (Petitioner) has filed multiple habeas corpus petitions. In the present petition, petitioner contends he is entitled to relief under the recent case of *Cunningham v. California* (2007) 166 L.Ed.2d. 856.

Petitioner's case was final prior to *Cunningham, supra*, and *Blakely v. Washington* (2004) 542 U.S. 296. Petitioner is therefore not entitled to relief.

Accordingly, the Petition is DENIED.

Date: ___12 Mar 2007___                        _____
                                               PAUL BERNAL
                                               JUDGE OF THE SUPERIOR COURT

Cc:     Petitioner
        District Attorney
        Research
        CJIC

EXHIBIT "B"



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

MAY 2 - 2007

MICHAEL J. YERLY, Clerk

By _____
DEPUTY

In re HARRY ELDRIDGE,

on Habeas Corpus.

H031358
(Santa Clara County
Super. Ct. No. 142464)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Premo, Acting P.J., Elia, J., and Duffy, J., participated in this decision.)

Dated _____MAY 2 - 2007_____    _____PREMO, J._____    Acting P.J.

EXHIBIT "C"

**S152690**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re HARRY ELDRIDGE on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

OCT **1 0** 2007

Frederick K. Ohlrich Clerk

---

Deputy

GEORGE

---

Chief Justice

EXHIBIT "D"

ORIGINAL
FILED

NOV 2 ○ 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRY ELDRIDGE, | No. C 07-5650 JSW (PR) |
| Petitioner, | **ORDER DISMISSING PETITION FOR A WRIT OF HABEAS CORPUS** |
| vs. | |
| RICHARD SUBIA, Warden, | (Docket No. 3) |
| Respondent. | |

This is a petition for a writ of habeas corpus brought *pro se* by Petitioner pursuant to 28 U.S.C. § 2254 challenging the constitutional validity of his state conviction. Petitioner has filed a motion to proceed *in forma pauperis* which is now GRANTED (docket no. 3). Petitioner's earlier habeas petition was filed under Case No. C:04-cv-0088 JSW (PR). That petition was denied as untimely by this Court on October 3, 2005. Petitioner now files a separate habeas petition raising what appear to be different claims on the than those raised in his earlier petition.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") was signed into law on April 24, 1996. Under AEDPA, a district court must dismiss claims presented in a second or successive habeas petition challenging the same conviction and sentence that were raised in a previous petition. *See* 28 U.S.C. § 2244(b)(1); *Babbitt v. Woodford*, 177 F.3d 744, 745-46 (9th Cir. 1999). Additionally, a district court must dismiss any new claims raised in a successive petition unless the petitioner received an order from the court of appeals authorizing the district court to consider the petition. 28

1  U.S.C. § 2244(b)(3)(A).

2       Here, the instant petition challenges the same conviction and sentence as the

3  previous petition decided by this Court in 2005. Petitioner has not presented an order

4  from the court of appeals authorizing the Court to consider these claims. Accordingly,

5  the Court must dismiss the instant petition in its entirety. Petitioner is free to seek such

6  an order from the United States Court of Appeals for the Ninth Circuit. *See*, 28 U.S.C. §

7  2244(b)(3)(A).

8                                  **CONCLUSION**

9       For the forgoing reasons, the petition for writ of habeas corpus is DISMISSED as

10  a second and successive petition. The Clerk shall close the file and enter judgment in

11  this matter.

12       IT IS SO ORDERED.

13  DATED: November 29, 2007

14

15                                    *Jeffrey S White*

16                              JEFFREY S. WHITE
                               United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28                                         2

1

UNITED STATES DISTRICT COURT

2

FOR THE

3

NORTHERN DISTRICT OF CALIFORNIA

4

5

6     HARRY EDLRIDGE,                              Case Number: CV07-05650 JSW

7                  Plaintiff,                      **CERTIFICATE OF SERVICE**

8          v.

9     RICHARD SUBIA et al,

10                 Defendant.

_____/

11

12     I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
       Court, Northern District of California.

13     That on November 29, 2007, I SERVED a true and correct copy(ies) of the attached, by placing
       said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by
14     depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
       delivery receptacle located in the Clerk's office.
15

16

17     Harry L. Eldridge
       P.O. Box 409000
18     H06424
       Ione, CA 95640-9000
19
       Dated: November 29, 2007             *Jennifer Ottolini*
20                                           Richard W. Wieking, Clerk
                                             By: Jennifer Ottolini, Deputy Clerk
21

22

23

24

25

26

27

28

EXHIBIT "E"

1

2

F I L E D

3 JAN 2 9 2008

4 KIRI TORRE
Chief Executive Officer
Superior Court of CA County of Santa Clara

5 BY _____ DEPUTY

6

7 **SUPERIOR COURT OF CALIFORNIA**

8 **COUNTY OF SANTA CLARA**

9

10 In re )
)
11 ) No. 142464
)
12 HARRY ELDRIDGE, ) O R D E R
)
13 Ex Parte )
)

14

15     Mr. ELDRIDGE has submitted to this Court a "Motion Requesting

16 Correction of Sentence" in which he seeks to vacate, modify,

17 'correct,' reduce, waive, reconsider, or dispose of, his restitution

18 fine/order.  All requested relief or action is DENIED.

19     Petitioner's claim of error should have been presented to the

20 Sixth District in either a direct appeal or in Petitioner's most

21 recent habeas corpus petition H031358.  The matter may not now be

22 considered by the Superior Court.

23

24 DATED: ___/_/__ , 2008    _____

25 DIANE NORTHWAY
JUDGE OF THE SUPERIOR COURT

26 cc:  Petitioner
District Attorney
27 Research(12-31A)
CJIC

28

1

EXHIBIT "F"



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| HARRY ELDRIDGE, | H032586 |
| | (Santa Clara County |
| Petitioner, | Super. Ct. No. 142464) |
| | |
| v. | |
| | FEB 1 5 2008 |
| THE SUPERIOR COURT OF | |
| SANTA CLARA COUNTY, | MICHAEL J. YERLY, Clerk |
| | By _____ |
| Respondent; | DEPUTY |
| | |
| THE PEOPLE, | |
| | |
| Real Party in Interest. | |

BY THE COURT:

The petition for writ of mandate is denied.

(Premo, Acting P.J., Elia, J., and Duffy, J., participated in this decision.)

Dated ___FEB 1 5 2008___          ___PREMO, J.___ Acting P.J.

EXHIBIT "G"

Court of Appeal, Sixth Appellate District - No. H032586
S161227

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

HARRY ELDRIDGE, Petitioner,

v.

SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;

THE PEOPLE, Real Party in Interest.

The petition for review is denied.

SUPREME COURT
FILED

APR – 9 2008

Frederick K. Ohlrich Clerk

_____
Deputy

_____
Chief Justice

EXHIBIT "H"

# ABSTRACT OF JUDGMENT – PRISON COMMITMENT

FORM DSL 29

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SANTA CLARA

**BRANCH** DOWNTOWN

COURT I.D. | 4 3 1 0 0

**PEOPLE OF THE STATE OF CALIFORNIA** versus — [X] PRESENT — CASE NUMBER (S) 142464 — A

**DEFENDANT:** HARRY LEE ELDRIDGE — B

**AKA:** — [ ] NOT PRESENT — C

**COMMITMENT TO STATE PRISON** — **AMENDED** — D

**ABSTRACT OF JUDGMENT** — **ABSTRACT** [ ] — E

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO | JUDGE | CLERK |
|---|---|---|---|
| JULY 26, 1991 | 11 | HONORABLE JOHN SCHATZ | A. COMANDA |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| P. HYNES | L. DARLING | R. CHERRINGTON | G. BEAL |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS)

[XX] ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT ____1____ (NUMBER OF PAGES)

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO | DAY | YEAR | CONVICTED BY JURY | COURT | PLEA | FINE IMPOSED | ENHANCEMENT | CONSECUTIVE 1/3 VIOL RT | CONSECUTIVE 1/3 MID | MISC/OUTSTD SENTENCES CONV OTHER | STAYED | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YEARS | MONTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04 | PC | 245(a)(1) | ASS W/ D/D WEAPON | 90 | 05 | 03 | 91 | XX | | | U | | | | | | 04 | 00 |
| 09 | PC | 136.1(c) | DISSUADE WITNESS | 90 | 05 | 03 | 91 | XX | | | M | | | | | | 03 | 00 |
| 16 | PC | 136.1(c) | DISSUADE WITNESS | 90 | 05 | 03 | 91 | XX | | | M | | | X | | | 03 | 00 |
| 11 | PC | 245(a)(1) | ASS W/ D/D WEAPON | 90 | 05 | 03 | 91 | XX | | | M | | | | | | 03 | 00 |
| 12 | PC | 245(a)(1) | ASS W/ D/D WEAPON | 90 | 05 | 03 | 91 | XX | | | M | X | | | | | 03 | 00 |

2. **ENHANCEMENTS** charged and found true TIED TO SPECIFIC COUNTS (mainly in the § 12022-series including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.): For each count list enhancements horizontally. Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add up time for enhancements on each line and enter line total in right-hand column.

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |

3. **ENHANCEMENTS** charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER. List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 non-violent prior prison terms under § 667.5(b) list § 667.5(b) times). Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add time for these enhancements and enter total in right-hand column. Also enter here any other enhancement not provided for in space 2.

| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
| | | | | | | | | | | |

4. **INCOMPLETED SENTENCE(S) CONSECUTIVE:**

| COUNTY | CASE NUMBER | CREDIT FOR TIME SERVED |
|---|---|---|
| | | |
| | | |

6. OTHER ORDERS: PROBATION DENIED, $100 RF, $100 FINE PER PC290.3, AIDS TESTING STIP/ORDERED, REGISTER PER PC 290, ADVISED OF PAROLE PERIOD, ADVISED OF APPEAL RIGHTS

Use additional sheets or plain paper if necessary.

| 6. TOTAL TIME IMPOSED ON ALL ATTACHMENT PAGES (FORM DSL 290-A) | 80 | 00 |
|---|---|---|
| 7. TIME STAYED TO COMPLY WITH 5-YEAR OR 10-YEAR LIMIT ON SUBORDINATE TERMS, DOUBLE-BASED-TERM LIMIT, ETC (Do not include § 654 stays or discretionary stays of term for enhancements.) | | |
| 8. TOTAL TIME IMPOSED: | 90 | 0C |

9. EXECUTION OF SENTENCE IMPOSED:

A. [X] AT INITIAL SENTENCING HEARING — B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL — C. [ ] AFTER REVOCATION OF PROBATION — D. [ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC § 1170(d)) — E. [ ] OTHER

| 10. DATE OF SENTENCE PRONOUNCED (MO) (DAY) (YR) | CREDIT FOR TIME SPENT IN CUSTODY | TOTAL DAYS | INCLUDING: | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS |
|---|---|---|---|---|---|---|
| 07/26/91 | | 505 | | 337 | 168 | [ ] DMH   [X] CDC |

11. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:

[ ] FORTHWITH — [ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS — INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT: — [ ] CALIF. INSTITUTION FOR WOMEN – FRONTERA — [X] CALIF. MEDICAL FACILITY – VACAVILLE — [ ] CALIF. INSTITUTION FOR MEN – CHINO — [ ] DEUEL VOC. INST. — [ ] SAN QUENTIN — [X] OTHER (SPECIFY): STAYED TO AUGUST 23, 1991

**CLERK OF THE COURT**

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | DATE |
|---|---|
| Adrienne Comanda  ADRIENNE COMANDA | JULY 31, 1991 |

This form is prescribed under Penal Code § 1213.5 to satisfy the requirements of § 1213 for determinate sentences. Attachments may be used but must be referred to in this document.

Form Adopted by the Judicial Council of California
Effective April 1, 1980

ABSTRACT OF JUDGMENT – PRISON COMMITMENT
FORM DSL 290

DISTRIBUTION:   PINK COPY – COURT FILE   YELLOW COPY – DEPARTMENT OF CORRECTIONS   WHITE COPY – ADMINISTRATIVE

000389

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT**
**ATTACHMENT PAGE**

FORM DSL 290-A

SUPERIOR COURT OF CALIFORNIA, COUNTY OF __SANTA CLARA__
BRANCH __DOWNTOWN__

COURT I.D. `L 4 3 1 1 0 0`

CASE NUMBER (S)

PEOPLE OF THE STATE OF CALIFORNIA versus    ☒ PRESENT    `142464`    - A
DEFENDANT:   HARRY LEE ELDRIDGE    - B
AKA:    ☐ NOT PRESENT    - C

COMMITMENT TO STATE PRISON    AMENDED ☐    - D
ABSTRACT OF JUDGMENT    ABSTRACT    - E

DATE OF HEARING
MO (DAY YR)
`07, 26, 91`

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS):

THIS IS ATTACHMENT PAGE NO _____    SENTENCE RELATION

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | MO | DAY | YEAR | CONVICTED BY JURY TRIAL | COURT TRIAL | PLEA | TERM E. BLAD | CONSECUTIVE | CONSECUTIVE 1/3 BOUND | CONSECUTIVE SENT FULL TIME | MISDMN FELONY REDUCED PER 17B OR 17C PER | ONE STAY | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YEARS | MONTHS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | PC | 236-237 | FALSE IMPRISONMENT | 90 | 05 | 03 | 90 | XX | | | M | X | | | | | 02 | 00 |
| 19 | PC | 236-237 | FALSE IMPRISONMENT | 90 | 05 | 03 | 90 | XX | | | M | X | | | | | 02 | 00 |
| 05 | PC | 261(2) | RAPE | 90 | 05 | 03 | 90 | XX | | | U | | X | | | | 08 | 00 |
| 06 | PC | 261(2) | RAPE | 90 | 05 | 03 | 90 | XX | | | U | | X | | | | 08 | 00 |
| 07 | PC | 288a(c) | ORAL COPULATION | 90 | 05 | 03 | 90 | XX | | | U | | X | | | | 08 | 00 |
| 08 | PC | 288a(c) | ORAL COPULATION | 90 | 05 | 03 | 90 | XX | | | U | | X | | | | 08 | 00 |
| 13 | PC | 261(2) | RAPE | 90 | 05 | 03 | 90 | XX | | | U | | X | | | | 08 | 00 |
| 14 | PC | 261(2) | RAPE | 90 | 05 | 03 | 90 | XX | | | U | | X | | | | 08 | 00 |
| 15 | PC | 261(2) | RAPE | 90 | 05 | 03 | 90 | XX | | | U | | X | | | | 08 | 00 |
| 20 | PC | 288a(c) | ORAL COPULATION | 90 | 05 | 03 | 90 | XX | | | U | | X | | | | 08 | 00 |
| 21 | PC | 288a(c) | ORAL COPULATION | 90 | 05 | 03 | 90 | XX | | | U | | X | | | | 08 | 00 |
| 22 | PC | 288a(c) | ORAL COPULATION | 90 | 05 | 03 | 90 | XX | | | U | | X | | | | 08 | 00 |

2. ENHANCEMENTS charged and found true, TIED TO SPECIFIC COUNTS (mainly in the 12022 series) for counts listed on this page.

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

3. ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER.

| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |

4. TOTAL TIME IMPOSED ON THIS ATTACHMENT PAGE:    `80  00`

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT**
**ATTACHMENT FORM DSL 290-A**

`000390`    Pen.C. 1213.5

Form Adopted by the
Judicial Council of California
Effective April 1, 1990

DISTRIBUTION:    PINK COPY – COURT FILE    YELLOW COPY – DEPARTMENT OF CORRECTIONS    WHITE COPY – ADMIN

EXHIBIT "I"

| COURT I.D. | | |
|---|---|---|
| 1 3 1 9 0 | CASE NUMBER (S) | |

PLE OF THE STATE OF CALIFORNIA versus · [X] PRESENT · 142464 · A
FENDANT: HARRY LEE ELDRIDGE · · B
AKA: · [ ] NOT PRESENT · C

MMITMENT TO STATE PRISON · AMENDED · D
STRACT OF JUDGMENT · ABSTRACT [ ] · E

| E OF HEARING (MO) (DAY) (YR) | DEPT. NO | JUDGE | | CLERK |
|---|---|---|---|---|
| 3-4-94 | 31 | ROBERT M. FOLEY | | D. OYAMA |

| ORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| CHRIS CORRIGAN | LORI DARLING | ROBERT CHERRINGTON | DIANE CUNNINGHAM |

DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS):

[X] ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT ___1___ (NUMBER OF PAGES)

| COUNT | CODE | SECTION NUMBER | CRIME | CRIME TIME COMMITTED | DATE OF CONVICTION MO | DAY | YEAR | CONVICTED BY JURY TRIAL | COURT TRIAL | PLEA | TERM (LMU) | CONCURRENT | CONSECUTIVE 1/3 VIOLENT | CONSECUTIVE 1/3 NON-VIO. | CONSECUTIVE FULL | INCOMPLETE SENTENCE(S) CS-HSR H | 654 STAY | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YEARS | MONTHS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | PC | 245(a)(1) | ASLT W/DDLY WPN-FLASHLTE | 90 | 05 | 03 | 91 | X | | | U | | | | | | | 4 | 0 |
| 9 | PC | 136.1(a) | DISSUADE WITNESS BY FRCE | 90 | 05 | 03 | 91 | X | | | M | | | X | | | | 3 | 0 |
| 10 | PC | 236/237 | FALSE IMPRISONMENT | 90 | 05 | 03 | 91 | X | | | M | X | | | | | | (2 | 0) |
| 11 | PC | 245(a)(1) | ASLT W/DDLY WPN-SWORD | 90 | 05 | 03 | 91 | X | | | M | | | X | | | | 1 | 0 |
| 12 | PC | 245(a)(1) | ASLT W/DDLY WPN-FISTS | 90 | 05 | 03 | 91 | X | | | M | | | X | | | | 1 | 0 |

ENHANCEMENTS charged and found true TIED TO SPECIFIC COUNTS (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.: For each count list enhancements horizontally. Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add up time for enhancements on each line and enter the total in right-hand column.

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |

ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER. List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 non-violent prior prison terms under § 667.5(b) list § 667.5(b) 2 times). Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add time for these enhancements and enter total in right-hand column. Also enter here any other enhancement not provided for in space 2.

| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
| | | | | | | | | | | |

INCOMPLETED SENTENCE(S) CONSECUTIVE:

5. OTHER ORDERS: $1000=REST/FINE · ADVISED OF APPEAL RIGHT. CALIFORNIA DEPT OF CORRECTIONS TO CALCU-LATE CREDIT TIME SERVED FROM 7-27-91 TO PRESENT. DEFENDANT TO BE RETURNED TO FOLSOM FORTHWITH.

| COUNTY | CASE NUMBER | CREDIT FOR TIME SERVED |
|---|---|---|
| | | |

Use additional sheets of plain paper if necessary.

| TOTAL TIME IMPOSED ON ALL ATTACHMENT PAGES (FORM DSL 290-A): | | 75 | 0 |
|---|---|---|---|

TIME STAYED TO COMPLY WITH 5-YEAR OR 10-YEAR LIMIT ON SUBORDINATE TERMS, DOUBLE-BASED-TERM LIMIT, ETC. (Do not include § 654 stays or discretionary stays of term for enhancements.)

| TOTAL TERM IMPOSED: | | 84 | 0 |
|---|---|---|---|

EXECUTION OF SENTENCE IMPOSED:

A. [ ] AT INITIAL SENTENCING HEARING   B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL   C. [ ] AFTER REVOCATION OF PROBATION   D. [X] AT RESENTENCING PURSUANT TO ~~RECALL~~ CDC notification   E. [ ] OTHER

| DATE OF SENTENCE PRONOUNCED (MO) (DAY) (YR) | CREDIT FOR TIME SPENT IN CUSTODY | TOTAL DAYS 505 | ACTUAL LOCAL TIME 337 | LOCAL CONDUCT CREDITS 168 | STATE INSTITUTIONS |
|---|---|---|---|---|---|
| 3-4-94 | THRU 7-26-91 *INCLUDING: | | | | [ ] DMH   [ ] CDC |

DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:

[X] FORTHWITH   [ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS   [ ] INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:   [ ] CALIF. INSTITUTION FOR WOMEN - FRONTERA   [ ] CALIF. MEDICAL FACILITY - VACAVILLE   [ ] SAN QUENTIN   [ ] CALIF. INSTITUTION FOR MEN - CHINO   [ ] DEUEL VOC. INST.

[X] OTHER (SPECIFY): DEFENDANT TO BE RETURNED TO FOLSOM FORTHWITH.

**CLERK OF THE COURT**

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | DATE |
|---|---|
| Saturnina S. Chica | MAR 8 1994 |

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT**
**ATTACHMENT PAGE**

FORM DSL 290-A

| ☒ SUPERIOR ☐ MUNICIPAL ☐ JUSTICE | COURT OF CALIFORNIA, COUNTY OF | SANTA CLARA |
|---|---|---|

COURT (I.D.) 4,3,1,0,0,    BRANCH OR JUDICIAL DISTRICT: HOJ

| | CASE NUMBER (S) | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA versus | ☒ PRESENT | 142464 | -A |
| DEFENDANT: HARRY LEE ELDRIDGE | | | -B |
| AKA: | ☐ NOT PRESENT | | -C |
| COMMITMENT TO STATE PRISON | AMENDED ☐ | | -D |
| ABSTRACT OF JUDGMENT | ABSTRACT | | -E |

DATE OF HEARING (MO) (DAY) (YR)
3 1 4 1 90

1  DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS)      SENTENCE RELATION

THIS IS ATTACHMENT PAGE NO.    1

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | MO | DAY | YEAR | CONVICTED BY | | | | | | | | | | | PRINCIPAL OR CONSECUTIVE TIME IMPOSED | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | JURY/TRIAL | COURT/TRIAL | PLEA | TIME PLEA/BAR | CONCURRENT | CONSECUTIVE 1/3 ⅓ 1/3 PC | CONSECUTIVE FULL TERM | INCOMPLETE SENTENCE CS WITH AM | CS OTHER | | | YEARS | MONTHS |
| 16 | PC | 136.1(c) | DISSUADE WITNESS BY FRCE | 90 | 05 | 03 | 91 | X | | | M | | | X | | | | | 3 | 0 |
| 19 | PC | 236/237 | FALSE IMPRISONMENT | 90 | 05 | 03 | 91 | X | | | | | X | | | | | 2 | 0 |
| 13 | PC | 261(2) | RAPE | 90 | 05 | 03 | 91 | X | | | U | | | X | | | | | 8 | 0 |
| 14 | PC | 261(2) | RAPE | 90 | 05 | 03 | 91 | X | | | U | | | X | | | | | 8 | 0 |
| 15 | PC | 261(2) | RAPE | 90 | 05 | 03 | 91 | X | | | U | | | X | | | | | 8 | 0 |
| 20 | PC | 288a(c) | ORAL COPULATION BY FORCE | 90 | 05 | 03 | 91 | X | | | U | | | X | | | | | 8 | 0 |
| 21 | PC | 288a(c) | ORAL COPULATION BY FORCE | 90 | 05 | 03 | 91 | X | | | U | | | X | | | | | 8 | 0 |
| 22 | PC | 288a(c) | ORAL COPULATION BY FORCE | 90 | 05 | 03 | 91 | X | | | | | | X | | | | | 8 | 0 |
| 5 | PC | 261(2) | RAPE | 90 | 05 | 03 | 91 | X | | | M | | | X | | | | | 6 | 0 |
| 6 | PC | 261(2) | RAPE | 90 | 05 | 03 | 91 | X | | | | | | X | | | | | 6 | 0 |
| 7 | PC | 288a(c) | ORAL COPULATION BY FORCE | 90 | 05 | 03 | 91 | X | | | M | | | X | | | | | 6 | 0 |
| 8 | PC | 288a(c) | ORAL COPULATION BY FORCE | 90 | 05 | 03 | 91 | X | | | | | | X | | | | | 6 | 0 |
| | | | | | | | | | | | | | | | | | | TOTAL | 75 | 0 |

2  ENHANCEMENTS charged and found true, TIED TO SPECIFIC COUNTS (mainly in the 12022 series) for counts listed on this page

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Connects by Dist Atty & Deft Cnsl | | | | | | | | | | | |
| Peo. Exhibit #1 - 8 photos | | | | | | | | | | | |
| Peo. Exhibit Deft Exh "A" - 2 documents | | | | | | | | | | | |
| Exhibits admitted and returned to parties | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | TOTAL |

3  ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER

| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
| | | | | | | | | | | |

| 4  TOTAL TIME IMPOSED ON THIS ATTACHMENT PAGE | 75 | 0 |
|---|---|---|

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT**
ATTACHMENT FORM DSL 290-A

Form Adopted by the
Judicial Council of California
Effective April 1, 1992

Pen.C 1213.5

| DISTRIBUTION | PINK COPY – COURT FILE | YELLOW COPY – DEPARTMENT OF CORRECTIONS | WHITE COPY – ADMINISTRATIVE OFFICE OF THE COURTS |
|---|---|---|---|

EXHIBIT "J"

FOR PUBLICATION
IN THE OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

THE PEOPLE,

    Plaintiff and Respondent,

    v.

HARRY LEE ELDRIDGE,

    Defendant and Appellant.

_____/

No. H008751
(Santa Clara County
Sup.Ct. No. 142464)

**FILED**

MAY 6 - 1993

Court of Appeal _____ Clerk

BY_____

Deputy

A jury found Harry Lee Eldridge guilty of seventeen sex-related felonies committed upon two victims, and he was sentenced to prison for 90 years. He appeals, asserting errors in removal and replacement of a juror during deliberations, in several of the trial court's evidentiary rulings, and in sentencing. The People concede that the matter must be remanded for resentencing. We find no other reversible error.

Eldridge was accused by amended information of a total twenty-two crimes against three women in separate episodes.

## The March 1989 Episode with Yvonne

The first episode occurred in March 1989 and involved a woman named Yvonne. To prove charges that Eldridge had falsely imprisoned her and had forced her to copulate him orally the People relied solely on Yvonne's testimony. Yvonne recounted that in March 1989 her sister Andrea lived with Eldridge, that at her sister's instance she visited the house where Eldridge lived, that she later returned to the house, and that Eldridge kept her

1

at the house agai t her will on both occasi s, tried to
persuade her to copulate him orally on the first occasion, and
forced her to do so on the second occasion. In his own behalf
Eldridge testified that Yvonne had come to the house voluntarily
on both occasions, that she had dressed and acted in a sexually
provocative manner, and that he had neither imprisoned her nor
engaged in sexual activity with her. Eldridge also called as a
witness a woman named Janet, who also lived at the house and was
described as Eldridge's former girlfriend, and whose testimony
concerning Yvonne was generally consistent with Eldridge's.
Another defense witness testified that it appeared to her Yvonne
was flirting with Eldridge. The jury acquitted Eldridge of both
counts arising out of the episode with Yvonne.

## The March 1990 Episode with Kathryn

The second episode occurred one year later, in March 1990.
A woman named Kathryn testified that she had been acquainted with
Eldridge and that one evening he asked her to help his wife drive
back from jail after Eldridge turned himself in. But when
Eldridge came for her, Kathryn testified, he was alone and he
took her to his house where he beat her with a flashlight and a
hammer, gagged her with a towel and washcloth, bound her with
wire and tape, raped her more than twice and forced her to
copulate him orally more than twice. She finally escaped from
the house when Eldridge was asleep.

Kathryn was a hesitant and inarticulate witness. She
acknowledged that she had taken drugs during the episode, and
that initially she did not wish to report the episode to the

2

police. To corr⟨ rate Kathryn's account t: People called several additional witnesses. Kathryn's boyfriend described her bloody and bruised condition when she returned and recited that Kathryn said she had been sexually assaulted by Eldridge. The boyfriend called the police. The police officer who responded to the call also described Kathryn's condition (including head injuries, scrapes, abrasions, and marks on her wrists), and testified that he took Kathryn to a hospital but that she did not immediately provide details of sexual assaults. Two sexual assault response team nurses from the hospital described Kathryn's injuries and were permitted to recite details of Kathryn's statements to them. A police sexual assault unit investigator named Phillips, who did not meet or interview Kathryn until the end of August 1990 (five months after the episode), was permitted to testify that at that time Kathryn had told him that Eldridge had raped her repeatedly, forced her to copulate him orally, hit her with a flashlight, a framing hammer, and a machete, and tied her with wire, duct tape and cloth.

Eldridge's defense was that Kathryn had initiated the episode by seeking drugs in exchange for sexual favors, that he had had consensual sex with Kathryn on ten previous occasions, that their only sexual contact in March had been consensual, and that any injuries Kathryn may have sustained were attributable to her own uncontrolled physical behavior after she used drugs at the house: According to Eldridge and Janet, Kathryn fell down at least twice and once tried to run through a window.

The People based eight counts of the amended information on the episode with Kathryn. The jury found Eldridge guilty of two

3

counts of forcibl rape, two counts of oral pulation, aggravated assault with a flashlight, forcibly dissuading Kathryn from prosecuting him, and false imprisonment, and acquitted him of aggravated assault with a sword.

## The August 1990 Episode with Elizabeth

The third episode, in August 1990, involved a girl named Elizabeth who was 14 years old, and pregnant, at the time. Elizabeth testified that Eldridge, whom she knew slightly, had invited her to watch movies. He picked her up and took her to a liquor store from which he brought her an opened soda. She drank the soda and "started feeling real weird." Elizabeth testified that Eldridge then took her to his house where he administered drugs to her, made her take off her clothes, struck her, tied and taped her and shackled her with handcuffs, masturbated in front of her, applied a vibrator and various artificial sexual devices to her, raped her more than three times, forced her to copulate him orally more than three times, and pierced her breast with a needle and inserted an earring into the hole. Elizabeth testified that a woman, by description Janet, participated in some of the sexual attacks on her. Elizabeth finally escaped; she had been gone four days. A relative called the police. Police officers and a sexual assault response team nurse corroborated details of Elizabeth's account. It was Elizabeth's account of the August 1990 episode that prompted Phillips to reinterview Kathryn.

Eldridge's defense was that he had gone looking for a prostitute and Elizabeth had been made available to him, by her

'grandmother, as , prostitute; that she dress . in a sophisticated way and appeared to be between 17 and 19 years old: that they agreed that if she stayed with him for a period of days he would obtain for her a pickup truck she very much wanted; that all of their sexual contact was consensual; that he never hit her; and that when he learned she was only 14 years old he counseled with her, offered her a place to live, and had no further sexual contact with her. Eldridge called several witnesses who said they had seen Eldridge and Elizabeth, together away from the house, during the four days and that Elizabeth had shown no distress and had taken no advantage of several opportunities simply to walk away. Janet acknowledged that Elizabeth had been at the house and generally corroborated Eldridge's version of Elizabeth's stay; she denied she had participated in any attacks on Elizabeth.

Of the twelve counts of the amended information arising out of the episode with Elizabeth the jury found Eldridge guilty of three counts of forcible rape, three counts of forcible oral copulation, two counts of aggravated assault (with a sword and with fists), forcibly dissuading Elizabeth from prosecuting him, and false imprisonment, and acquitted him of kidnaping and mayhem.

## 1.  Removal and Replacement of Juror

On the third day of jury deliberation the trial court removed a juror and replaced him with an alternate juror; shortly thereafter the jury returned its verdicts. Eldridge asserts

(a)  That the record does not support the trial court's conclusion that the removed juror had been unable to perform his

5

duty, and therefore the removal violated Eldridge's Sixth
Amendment right to trial by an impartial jury; and

(b)   That the court did not sufficiently instruct the jury,
after the juror was replaced, that its deliberations must be
commenced anew.[1]

## a.   Inability to Perform Duties

Where (as in this case) alternate jurors have been
selected, "[i]f at any time, whether before or after the final
submission of the case to the jury, a juror . . . upon . . . good
cause shown to the court is found to be unable to perform his
duty, . . . the court may order him to be discharged and draw the
name of an alternate, who shall then take his place in the jury
box . . . ." (Pen. Code, § 1089; cf. also Code Civ. Proc.,
§ 233.)

Eldridge argues that the record does not furnish good cause
for a finding that the removed juror was unable to perform his
duty.

The problem was foreshadowed at the end of the first day of
deliberation (a Wednesday), after the jury asked for, and was
denied, access to police reports and preliminary examination
transcripts that were not in evidence. Juror Five (later
identified as the jury foreperson) remarked: "Probably will

---

[1] Eldridge has withdrawn his contention that the jury foreman's
indication that at the time of the removal the jury had reached
unspecified unanimous verdicts as to three counts raises
former-jeopardy issues which vitiate all the verdicts.

6

we'll [sic] be he    Friday or next Monday the    Friday at

best." In response to the trial court's question Juror Five said

no votes had been taken. Juror Twelve said: "We did on -- "

Juror Three interrupted: "We're not able to. We haven't been

unanimous on any of our discussions." Juror Five said: "We're

getting nowhere. [¶] The Court: Well, it's only the first day.

[¶] Juror Five: Many, many more days like this, I think."

Deliberations were then recessed overnight.

After lunch Thursday, the second day of deliberation, the

bailiff informed the court that Juror Twelve had approached him

"and asked what would happen if he wasn't to come back. And he

referred to he had several different problems. Something about

losing a job, he wasn't eating, couldn't sleep . . . ."

Out of the presence of the other jurors, Juror Twelve told

the court and counsel: "I find myself under personal attack by

three of the specific jurors. They surrounded me with all

pictures yesterday in hope I would see them better. They've made

dozens of statements in regards to me being responsible, being·

the cause of this problem -- of their problem, of their inability

to go back to work or their being involved in a hung jury."

Juror Twelve said he had no personal problem aside the jury

deliberations, "[b]ut it's a growing concern in the desire to

come back here again. I have no interest today at this time to

return again. And I am finding that concern growing. I can't

eat. I quit my job."

The court remarked: "I notice you're getting kind of

choked up. [¶] Juror Twelve: I can't function. [¶] The Court: You

don't feel that you could deliberate any further with the other

jurors? [¶] Juror Twelve: To this point, I have already expressed my opinions on all twenty-two counts and the reasons why, speculation, through experience, through my beliefs. And at this time, I will not change." Juror Twelve complained that "[a]ll of the deliberations are being directed at me specifically," that "I am growing angrier by the hour, and angrier by the hour," that "[m]y integrity is being questioned, my intelligence is being questioned, my morals is being questioned." He stated that "that's not why I came here. I don't believe it's a part, or should be a part of this proceeding. [¶] I know what I feel. I have examined my feelings, and I still feel confirmed in what I believe, period."

Juror Twelve also volunteered that "[t]hey wanted to throw me out the first hour I was in there. They said, you know, maybe we ought to get you out of here, go grab one of the alternates before they go home. [¶] I offered, I said, 'Fine, do it, if that's possible.'" He again indicated there were "three particular jurors" who, he felt, "have made attacks on my integrity, my intelligence, morals."

Juror Twelve was then excused with the assurance that the court and counsel would "discuss the matter, . . . [and] see what we can do." After discussion in which both counsel expressed a desire to research the law, the court called the jury back to hear a readback of testimony previously requested. After the readback the court asked the foreperson whether any votes had been taken; she replied that several votes had been taken but only one unanimous verdict reached: "[O]therwise, we're essentially hung." The foreperson expressed a desire to have "an

advisory talk with the Court and counsel. Ultimately the Court
sent the jury back out to deliberate and excused counsel to begin
their research. Thereafter the jury's deliberations were
recessed for the night.

On Friday morning the prosecutor asked the court to question
the foreperson "so we can ascertain whether or not Juror . . .
Twelve should be removed for good cause." Defense counsel agreed
the foreperson should be heard but indicated the defense would
object to removing the juror. The foreperson was brought in.

The court structured the colloquy by saying that "from what
I was told, . . . one of the jurors was not participating in the
case so far as refusing to participate?" The foreperson
responded: "Right. He walked in the jury room, said, 'My mind
is this. I'm not going to change it. I'm not going to listen to
anybody. That's the end of the story.' [¶] Now we're trying to
say, you know, 'We have got to work on this as a team. We have
all got to keep an open mind.' 'I refuse to keep an open mind.'
[¶] But -- this is something I have heard from a couple of other
jurors, but he has admitted he would accept a bribe to change his
mind." "[W]e have all said our mind's made up, and he just
refuses to listen to the reasons why we feel that [Eldridge]
would be guilty or not guilty, and that's the end of the story.
[¶] He just says, 'My mind's this, I am not going to change it.
I'm not going to do my job by keeping an open mind.' [¶] . . . .
[¶] For the most part, we would have been done the same day that
we went in deliberations . . . or early the next day."

The foreperson indicated that the jury had decided on three
of the counts. "[P]ersonally I feel if we . . . allow him to be

9

excused and allow ne of the alternate juror. we can get a
decision by the end of the day on all the counts. . . . [¶] . . .
[¶] We have been in there all morning. We haven't even taken a
vote yet trying to work as a team. We only do work on one
level. We need to work together and see each other's reasons for
what they are thinking."

"The Court: Is he refusing to communicate with you what his
views are, discuss those?

"Juror Five: Kind of since -- yes. He says, 'My mind is
made up, and that's the end of the story.' He refuses -- he's
[sic] seems to be listening to the two men more than anything.
We're saying, 'What do you think about this?' And he just says,
'Well, I don't believe anything.' And it's the end of the
story. 'Now my mind's made up.'"

The foreperson was excused. In argument the prosecutor
took the position Juror Twelve was "not in his right mind," and
that in any event "he has refused to exercise his duty as a juror
. . . to weigh and evaluate the evidence and the credibility of
witnesses with impartiality." Defense counsel responded that in
his view "there's merely a difference of opinion between some of
the jurors regarding the validity of some of the counts. . . .
[¶] . . . [T]he fact that he's made up his mind after hearing the
evidence isn't certainly reason to excuse him from the jury."

After further colloquy Juror Twelve sent word he had "had a
change of mind" and would like to speak to the court and "to
complete his duty as a juror." He was invited in. He explained
that he had discussed the matter with the other jurors and had
found that other jurors "came to my aid" and asked the three

10

jurors to refrain from making statements to the nine jurors twelve had found objectionable. He said he was prepared to listen to all the evidence, but his position as to whether he would consider other jurors' points of view was not clear: "I spent the majority of the time this morning in the general sense attempting to convey my feelings, my reasons and my opinions in regards to this case. And I believe everyone has a better understanding as to why I have formed the opinions that I have." He focused on his relief that what he had regarded as "a personal attack by those specific jurors" would now be at an end, and described his personal life in some detail. The court asked about the story of his willingness to accept a bribe to change his position, and Juror Twelve passed it off as "a joking comment."

The court led him back to whether "you already have a fixed opinion . . . ." Juror Twelve said: "I believe I have formed an opinion. I believe I have both, but I have also -- also offered all the time that anyone feels is necessary to attempt to go over all the evidence, and I will reconsider anything that's presented to me."

Juror Twelve then left the courtroom. After brief argument the trial court concluded that "I don't think the juror is parti-cipating in connection with the deliberations. He has a fixed opinion from the time he came in here, and he has not been able to discuss the matter with the other jurors in the manner that most jurors do operate. [¶] His statement that apparently was made, I gather in a joking manner. I assume that his opinion could be swayed by the money. [¶] I think the emotional breakdown that

11

occurred yesterd  is such that it would be  oper to remove the juror and call in one of the alternates." It was so ordered. Defense counsel, arguing that "basically it's just a difference of opinion," moved for a mistrial; the motion was denied.

In the context of removal of a trial juror for inability to serve, "[t]he determination of 'good cause' . . . is one calling for the exercise of the court's discretion; and if there is any substantial evidence supporting that decision, it will be upheld on appeal. [Citations.]" (People v. Thomas (1990) 218 Cal.App.3d 1477, 1484.) Nevertheless the court's decision, and the evidence to support it, must satisfy narrow criteria: "[T]he trial court has at most a limited discretion to determine that the facts show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality." (People v. Compton (1971) 6 Cal.3d 55, 60, fn. omitted, quoted in People v. Collins (1976) 17 Cal.3d 687, 696; cf. People v. Thomas, supra, 218 Cal.App.3d at p. 1484 ["bias may not be presumed"].)

Eldridge argues that the record does not meet these criteria.

We agree with Eldridge that the question for the trial court was whether Juror Twelve was unable to perform his duty, but we conclude that Eldridge does not assign sufficient weight to the juror's duty to deliberate with his or her fellow jurors, and that his apparent assumption that the cases required demonstration as a matter of law that Juror Twelve was unable to perform that duty is incorrect.

12

jurors are not required, and may not be directed, to agree with one another: They cannot (for example) be instructed to consider the numerical division of the jury in forming or reexamining their views. (People v. Gainer (1977) 19 Cal.3d 835, 852.) But jurors are required to deliberate: Each juror must not only fully and candidly state his or her own views of the evidence and the issues but also listen to the views of other jurors and be prepared to reconsider his or her own views if the views of others suggest that reconsideration is appropriate. "At the heart of [the] right to a unanimous verdict is the defendant's right to have the jury reach a verdict, if they can, only after the jury has deliberated on the evidence." (People v. Peters (1982) 128 Cal.App.3d 75, 90.) In the very case that gave rise to the "Allen charge" our Supreme Court later disapproved in People v. Gainer, supra, the U.S. Supreme Court stated perceptions that remain valid: "While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury-room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. . . . . It cannot be that each juror should go to the jury-room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself." (Allen v. United States (1896) 164 U.S. 492, 501-502; cf. People v. Peters, supra, 128 Cal.App.3d at p. 90.) "Deliberation must be the very essence of the jury's function." (People v. Peters, supra, 128 Cal.App.3d

13

at p. 90; cf. also _eople v. Oliver (1987) 19. Cal.App.3d 423, 429-431; People v. Bruneman (1935) 4 Cal.App.2d 75, 30-31; People v. Collins (1976) 17 Cal.3d 687, 693; People v. Selby (1926) 199 Cal. 426, 439.)

The jurors were instructed, in the language of CALJIC Nos. 17.40 and 17.41, to deliberate with one another. It was each juror's duty to do so.

We are satisfied that the record fully justifies the trial court's finding that Juror Twelve could not or would not deliberate.

No one has contradicted the foreperson's testimony that Juror Twelve "walked in the jury room, said, 'My mind is this. I'm not going to change it. I'm not going to listen to anybody. That's the end of the story." Juror Twelve himself acknowledged that "I have already expressed my opinions on all twenty-two counts and the reasons why," that "at this time, I will not change," and that "[t]hey wanted to throw me out the first hour I was in there." The foreperson attributed to him a statement that "'My mind's this, I am not going to change it. I'm not going to do my job by keeping an open mind.'"

Eldridge suggests that Juror Twelve's subsequent indication of a willingness to proceed should have sufficed to make clear that he was in fact able, and willing, to deliberate. We find the suggestion unpersuasive. Juror Twelve said that he had now received assurances that he would be treated with a more acceptable degree of respect, and therefore that he would be more comfortable in the jury room and could continue as a juror. But the court could properly have deemed his professed willingness to

14

"reconsider anything that's presented to me"   neither
unequivocal nor persuasive in full context. In the course of
discussion of his change of position Juror Twelve said among
other things that he had spent "the majority of the time this
morning" explaining his reasons and opinions to the other jurors,
and that "I believe everyone has a better understanding as to why
I have formed the opinions that I have." He mentioned that "I
was asked to lie this morning. I told them I couldn't do that
either, that that wouldn't provide a consistent example of the
person that I am." The court asked him if he had "a fixed
opinion in connection with this case?" When Juror Twelve
appeared about to state such an opinion the court cut him off,
admonishing him not to state his belief. Juror Twelve then
said: "I believe I have formed an opinion. I believe I have
both, but I have also -- also offered all the time that anyone
feels is necessary to attempt to go over all the evidence, and I
will reconsider anything that's presented to me."

The trial court could properly have concluded that Juror
Twelve was now able to perform no more than half of his duty to
deliberate: Although he was now apparently willing to state his
view to the other jurors, the court could properly have concluded
that he was not prepared to hear, or even necessarily to listen
to, the other jurors' views. The court properly took Juror
Twelve's "emotional breakdown" of the previous day into account
in concluding that Juror Twelve was not "participating in
connection with the deliberations."

We conclude the record shows as a demonstrable reality that
Juror Twelve could not or would not deliberate and for that

reason was unable ɔ perform his duties as a 'uror, and that the trial court's determination that Juror Twelve should no longer serve was justified.

### b. Instruction to Begin Deliberation Anew

The Supreme Court has construed Penal Code section 1089 to provide that when a juror is substituted after final submission the court shall instruct the jury "to set aside and disregard all past deliberations and begin deliberating anew. The jury should be further advised that one of its members has been discharged and replaced with an alternate juror as provided by law; that the law grants to the People and to the defendant the right to a verdict reached only after full participation of the 12 jurors who ultimately return a verdict; that this right may only be assured if the jury begins deliberations again from the beginning; and that each remaining original juror must set aside and disregard the earlier deliberations as if they had not been had." (People v. Collins, supra, 17 Cal.3d at p. 694.) CALJIC No. 17.51 embodies the substance of the required instruction.

The trial court did not give CALJIC No. 17.51. Instead, having caused the alternate juror to be sworn and seated, the court admonished the reconstituted jury as follows:

"Ladies and gentlemen, where an alternate juror is seated after the case is in trial, it's necessary that the jury understand that you are to consider your deliberations that you have gone through, that they no longer exist and you treat the case as though you had -- you are here for the first time. [¶] In any event, whatever decisions or determination you have made earlier, please set those aside, and that way the juror who has

16

been just sworn in  s in the same position tha* you are.  So
whatever you decided before, doesn't have any effiicacy at this
time and the alternate juror who was sworn, stands at the same
position as the rest of the jurors."

The court directed a second readback of testimony the first
jury had requested and heard one day earlier.  The court then
dealt with verdicts of acquittal the first jury had already
reached (and the reconstituted jury ultimately reiterated) as to
three counts, admonishing the jury that "since we are starting
anew, the verdicts that you have recorded, disregard them and
let's start anew in your deliberations."

Eldridge argues that the trial court's instruction was
inadequate, "could only give the impression that the admonition
to start all over again was hardly literal and of only casual
import," and "invited" the jury "to view the court's action as a
judicial imprimatur of the majority view."  He notes that the
reconstituted jury required only two hours to reach verdicts on
all twenty-two counts.  He finds "palpable" prejudice.

We disagree with Eldridge.  Although we would by no means
encourage trial courts, in these or any other circumstances,
lightly to depart from approved forms of instruction designed to
implement legislative or judicial mandates, we conclude that in
this instance the court's admonitions sufficiently conveyed the
substance of the instruction the Supreme Court requires.  We note
that the court invited counsel to comment on the admonition
immediately after it was given, and that neither attorney
objected or requested further instruction.  We find no error.

17

2. Evidentiary Rulings

Eldridge argues that the trial court committed three
reversible errors in admission of evidence, and that the
cumulative impact of the errors was to deny him due process.

a. "Bad things"

Yvonne testified that on her first visit to Eldridge's
house she felt trapped and afraid in the face of words, acts, and
demeanor from which she understood that Eldridge would not let
her leave and would insist that she perform sexual acts with
him. She enumerated the circumstances. The prosecutor then
asked: "Was there any other reason that you were afraid of him
that you have not told us yet?" Yvonne replied: "Things I have
heard that might be irrelevant, but I have heard a lot of bad
things about him and what he has done."

Defense counsel objected and moved to strike the answer "as
to what she has heard, bad things she has heard." The prosecutor
asserted that the testimony "is not offered for the truth of the
matter but for her state of mind, terms of false imprisonment."
The court ruled that the testimony could come in "for that
limited purpose only." The prosecutor was then permitted, over
defense objection and apparently on the same basis, to elicit
Yvonne's statement that she had heard "[f]rom my sister, he has
abused her physically, you know. At a friend's house there was a
girlfriend who said her sister was raped by him and stuff like
that. Before I even knew of him."

Eldridge argues, in the alternative, (1) that the testimony
should have been excluded because Yvonne's state of mind was

18

immaterial and therefore her testimony as to what she had heard
was irrelevant, and (2) that if this point must be deemed waived
for want of a more articulate objection at trial then he was
denied effective assistance of counsel. Given the potential
impact of Yvonne's testimony upon the jury's consideration of all
pending counts, Eldridge's arguments are not mooted by his
acquittal on both counts pertinent to Yvonne.

Eldridge initially relied on the generalization that "[i]n
the criminal context, the state of mind of the victim is
generally not relevant to the factual issues in the case and
hence is not admissible." (In re Cheryl H. (1984) 153 Cal.App.3d
1098, 1132, fn. 38.) He asserted specifically that Yvonne's
state of mind was immaterial for purposes of the false
imprisonment count. The People responded that Yvonne's fear of
Eldridge was in fact material to the forcible oral copulation
count, and that her knowledge of reports of "bad things about"
Eldridge was relevant to prove the nature and extent of her
fear. Eldridge replies that the fear element of oral copulation
accomplished "against the victim's will by means of force,
violence, duress, menace, or fear . . . " (Pen. Code, § 288a,
subd. (c)) "does not refer to the mere subjective state of mind
of the victim. It refers to the objective acts of the defendant
that are designed to induce this fear, [which] may include . . .
knowing manipulation of the victim's subjective fear."

We agree with the People's analysis. We are satisfied that
the word "fear" in the quoted provision of the oral copulation
statute, as in the similar provision of the rape statute (Pen.
Code, § 261, subd. (a)(2)), does indeed refer to the victim's

19

subjective dread    the perpetrator, and tha' :o prove that the

proscribed act was accomplished "by means of . . . fear" the

prosecutor is entitled to prove the nature and the source of the

victim's subjective fear. (Cf. People v. Solis (1985) 172

Cal.App.3d 877, 886-887; cf. also People v. Jeff (1988) 204

Cal.App.3d 309, 324-325; People v. Senior (1992) 3 Cal.App.4th

765, 776.) Yvonne's testimony was relevant and admissible.  It

follows that trial counsel's failure to make the objection

appellate counsel would have made did not deny Eldridge effective

assistance.

### b.  Kathryn's Several Extrajudicial Statements

Before trial Kathryn made several statements, to her

boyfriend, to police officers, and to nurses, concerning what had

happened to her.  Many of these statements, beginning with her

initial complaint to her boyfriend and continuing through her

interview by Officer Phillips five months later, were admitted in

evidence (over defense objection) as prior consistent

statements.  On appeal Eldridge asserts that only Kathryn's fresh

complaint to her boyfriend should have come in, and that her

subsequent statements were hearsay to which the exception for

prior consistent statements could not be made to apply.

Subdivision (b) of Evidence Code section 791 provides that

"[e]vidence of a statement previously made by a witness that is

consistent with his [or her] testimony at the hearing is

inadmissible to support his [or her] credibility unless it is

offered after: [¶] . . . . [¶] (b) An express or implied charge

has been made that his [or her] testimony at the hearing is

20

recently fabricat. or is influenced by bias .: other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Cf. also Evid. Code, § 1236.)

It is now well established that an implied charge of recent fabrication or improper motive may be raised by "'[t]he mere asking of questions'" on cross-examination. (People v. Andrews (1989) 49 Cal.3d 200, 210; People v. Bunyard (1988) 45 Cal.3d 1189, 1209.) Eldridge is willing to assume his attorney's cross-examination of Kathryn and other prosecution witnesses did imply that Kathryn had an improper motive to conceal, from her boyfriend, both her previous involvement with Eldridge and her use of drugs. But Eldridge argues that this motive existed from the outset and thus that none of Kathryn's extrajudicial statements could meet the requirement that they have been made before the motive for fabrication allegedly arose.

The People agree that defense counsel's questions implied Kathryn had a motive to fabricate, but disagree with Eldridge as to the timing of the motive and the nature of the fabrication. In the People's view counsel implied that Kathryn had been told what to say, and had been pressed to say it, by law enforcement authorities sometime after her last extrajudicial statement. Thus, the People argue, Kathryn's extrajudicial statements predated the asserted motive for fabrication and were properly admitted as prior consistent statements.

The trial transcript lends very little support to either side's hypothesis. Defense counsel obviously wanted the jury to disbelieve Kathryn and to believe Eldridge, but it is fair to say

21

that his cross-exa nation of the various pro cution witnesses does not suggest a single coherent theory in derogation of Kathryn's credibility.

The first prosecution witness pertinent to the attack on Kathryn was her boyfriend; Eldridge relies heavily on counsel's cross-examination of the boyfriend to support his theory that Kathryn was motivated from the outset to lie to protect their relationship, but on its face the cross-examination suggests little more than that the boyfriend had very little pertinent information to add to what he had said on direct.

The next witness was Kathryn herself. Counsel's cross-examination of Kathryn began late in the day. In the few minutes left before the evening recess counsel picked at details of Kathryn's testimony on direct, attempted to bring her around to a version of the facts more consistent with Eldridge's, obtained an acknowledgment that she had testified inaccurately at preliminary examination, and opened the subject of her drug use, but did not otherwise suggest, explicitly or implicitly, recent fabrication or improper motive.

On the following morning Kathryn did not appear on time; in her place the People were permitted to call as a witness Officer Phillips, who had taken Kathryn's statement five months after the event. The People tendered the statement; defense counsel objected that it was hearsay. The People argued that "[i]t's prior consistent statements to rebut the charge, recent fabrication raised upon cross-examination." The trial court overruled the defense objection and Phillips was permitted to recite details from Kathryn's statement.

22

Kathryn the~ arrived and was recalled t the stand, and
defense counsel resumed his cross-examination. Kathryn's memory
appeared to have faded overnight. Counsel attempted to review
details many of which Kathryn professed to be unable to recall.
The first hint that counsel might suspect recent fabrication came
when Kathryn suddenly blurted out that Eldridge's "wife" had
"held the gun on me": Counsel asked whether she had ever
mentioned a gun before and Kathryn said "I don't know, okay?"
Counsel then continued to review details, essentially taking
Kathryn back through her story. From time to time counsel would
return to the question of Kathryn's drug use, either at the time
of the attack or at the time of trial, gradually focusing on the
possibility Kathryn's recollection had been adversely affected by
drug use.

        After one sequence in which Kathryn said among other things
that "I don't want to remember a lot of stuff that . . . happened
to me" and that "the whole thing just doesn't want me to
remember," defense counsel asked: "In other words, basically all
you can remember . . . is the very specific elements of these
offenses when the D.A. asked you about, isn't that right?"
Kathryn began an essentially nonresponsive answer and counsel
asked if she wanted him to repeat the question. The prosecutor
then objected that the question had been argumentative, the court
directed counsel to reframe the question, and counsel returned to
exploring such details as Kathryn could recall.

        In the course of another sequence in which counsel
suggested there were many occasions on which Kathryn could simply
have walked away from Eldridge's house, Kathryn said: "I just

23

know that I tried to get out and he didn't let me get out, so -- he tied me up so I couldn't get out. Why would I want to lie about something like that?" Counsel responded "It's a good question," but then immediately went back to details.

Toward the end of his cross-examination counsel obtained Kathryn's acknowledgment that she did not immediately call the police and that she did not report she had been sexually attacked either to her boyfriend or initially to the police or hospital personnel. Kathryn testified that she led police to Eldridge's house the second night, but that "because I didn't know anything about him, they didn't do anything because I didn't know his last name." Counsel asked: "You didn't want to press any charges against him until August 31st. Isn't it true that they were on your back during that time, asking you to call, leaving messages for you, you never returned their call, never went in to see them, never would sign a complaint for months; isn't that true?" Kathryn responded: "Look, I was just really scared, okay? I'm not sure. Okay?"

After a few more questions counsel terminated his cross-examination.

It is fair to generalize that courts have been quite willing to infer, from cross-examination only slightly more focused than this, a defense charge of recent fabrication or improper motive. In this instance we could, by indulging in a similarly liberal reading of the record, divine a defense theory that the story Kathryn told Phillips in August, and ultimately told the jury at trial, was not true and had been fabricated by Kathryn on the occasion and for the purpose of the August inter-

24

view. Such a the y would rationalize subse ent admission, under Evidence Code section 791, of statements (generally consistent with her trial testimony) that Kathryn had made to two sexual assault response team nurses and to a police officer within the first 24 hours after she returned from Eldridge's house.

We cannot similarly rationalize admission of the August statement to Phillips: We are not persuaded by the People's hypothesis that defense counsel's questions implied a charge of additional fabrication, after the August interview, under pressure from the prosecutor. The only pertinent question on cross-examination suggested no more than that Kathryn now chose to remember no more than the bare elements of the various crimes, and this question was not asked until after the trial court had admitted the August statement over objection. In short we find no persuasive or timely showing that the August statement was made "before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).) The People suggest no other basis for admission of the statement. We conclude the August statement was erroneously admitted.

But we further conclude that the error was harmless. Kathryn's trial testimony, although hesitant and inarticulate, was clear enough and was substantially corroborated and rehabilitated by the testimony of her boyfriend and of the police officer and two nurses who saw and talked with her within the first 24 hours. Only the identity of the perpetrator was not firmly fixed before the August interview, and at trial Eldridge (although he denied the charged criminal conduct) chose to admit that he had been with Kathryn, and had engaged in sexual conduct

25

with her, at the · levant time. It is not r :onably probable
that a result more favorable to Eldridge would have been reached
had the August statement been excluded. (People v. Watson (1956)
46 Cal.2d 818, 836.)

### c. Testimony of Grace

In her opening statement the prosecutor referred to "another
witness who was never victimized by this man but we have the same
pattern of conduct. Her name is Grace . . . . She is the
daughter of Janet . . . ." Defense counsel objected that such
evidence would be irrelevant and prejudicial, but when the
prosecutor asserted that the evidence would prove the "defendant's
intent regarding his motive, plan, or scheme" the trial court
overruled the objection.

The People called Grace, out of order and apparently as a
rebuttal witness, during the defense case in chief. Before Grace
testified the court conducted a hearing out of the presence of
the jury, at which defense counsel objected that the Grace's
testimony would relate to "an alleged incident involving herself
as a potential victim with . . . Eldridge" in 1987, and that the
evidence would be irrelevant and inadmissible under Evidence Code
section 1101. The prosecutor responded that the evidence was
relevant: "[T]he evidence . . . is that Janet . . . actually set
up her own daughter in the exact same manner that Andrea . . .
set up her sister [Yvonne] to go over to the defendant's house so
the defendant would be able to have sex with her. . . . [T]he
defense has put into issue consent. [¶] . . . [A]n issue is the
defendant's intent, his motive, his method of operation. It is

26

very similar to ea    of these cases the way h  does it. [¶] Even
more strongly, the People wish to introduce evidence that when
[Grace] was over at his house, he told her that he could make her
have sex if he wanted to by putting drugs in her soda, which is
exactly what he did to . . . Elizabeth . . . . And I think the
People are, your honor, entitled to get it in." Defense counsel
replied that the prejudicial impact of the evidence would
outweigh any probative value. The court concluded that "the
probative value outweighs any prejudicial effect" and ruled that
the testimony could come in.

Grace confirmed that she was the daughter of Eldridge's
friend Janet. Over defense objection Grace was permitted to
testify that when she was 17 years old Janet had sent her over to
"have breakfast with Harry Eldridge," and that after Grace
declined Eldridge's offers of pornographic movies and "loungerie"
she "thought he got mad because he said, 'Well, if I wanted to
have sex with you, I would have put something in your drink and
you wouldn't know what hit you afterwards.'" According to Grace,
nothing came of Eldridge's overtures and Grace simply went home.

The trial court denied a defense motion to strike this
testimony. Thereafter the prosecutor encouraged the jury to use
the testimony in various ways:

(1) Janet had been called as a defense witness, before
Grace testified, and had undertaken to support Eldridge's
exculpatory versions of the encounters with Yvonne, Kathryn, and
Elizabeth. On cross-examination by the prosecutor Janet had
denied setting her daughter up to have sex with Eldridge. In
summation the prosecutor did not refer to the conflict between

27

Janet's testimony and Grace's, but did attack the credibility of Janet as "the woman who set the defendant up with her own daughter."

(2) The People's theory, suggested both in opening statement and in summation, was that Eldridge had doped Elizabeth's soda in order to have sex with her. In summation the prosecutor reminded the jury of Grace's testimony that Eldridge had said "he could put drugs in her soda. [¶] That is very significant because it fits into exactly what he did to Elizabeth later on when he got bizarre."

(3) The prosecutor also made Grace's testimony a part of her argument, in summation, that Eldridge tended to prey on women who were young or otherwise weak: "[H]e picks his women very carefully. Because he picks women that are weak to begin with. He picks women that are vulnerable, that he thinks he can control. And I guess he thought he could just keep on getting away with it. And you can see the pattern starting back in 1987. Who does he pick? Janet . . . . And she has been with him since then, virtually his slave. And he has her so enslaved that she leaves her children hungry and that she set up her own daughter Grace . . . to come over and have breakfast with this man, the defendant. And it's there that he tries to get a seventeen year old girl loungerie [sic]. He tried to make her have sex with him . . . ."

On appeal Eldridge renews objections he made in the trial court: That Grace's testimony was irrelevant and, alternatively, that any conceivable relevance the testimony may have had was outweighed by its manifest tendency to show both Eldridge and his

28

friend Janet in a highly prejudicial light.

Certainly none of the theories of relevance the People suggested in the trial court, implicitly or explicitly, would have overcome Eldridge's objections.

The most obvious difficulty with Grace's testimony was that on its face it tended to prove no more than that Eldridge was criminally disposed to prey on women and, for that purpose, to "put something in" their drinks. The prosecutor did not deny this implication; instead she sought to exploit it to persuade the jury that Eldridge had in fact sexually attacked Yvonne, Kathryn, and Elizabeth. But the law is clear that, subject to specific exceptions, "evidence of a person's character or a trait of his [or her] character . . . is inadmissible when offered to prove his [or her] conduct on a specified occasion" (Evid. Code, § 1101, subd. (a)), and case law has emphasized that this rule is particularly applicable to evidence which proves no more than that a criminal defendant's "disposition to commit" the act or acts charged. (Id. subd. (b); People v. Thompson (1980) 27 Cal.3d 303, 314-321; cf. People v. Tassell (1984) 36 Cal.3d 77, 83-89.)

The prosecutor's broad references to "defendant's intent regarding his motive, plan, or scheme" and to "the defendant's intent, his motive, his method of operation" were presumably attempts to invoke the equally well-established rule that even character evidence may come in if it is shown to be relevant to prove some material fact beyond mere criminal predisposition. (Evid. Code, § 1101, subd. (b); People v. Thompson, supra, 27 Cal.3d 303, 314-321; People v. Robbins (1988) 45 Cal.3d 867, 878-881; People v. Sully (1991) 53 Cal.3d 1195, 1224-1226.)   But

29

the prosecutor's u' ocused recital fell far s' rt of suggesting any specific fact as to which the evidence could meet the criteria of admissibility the cases have set down.

Nor did the use the prosecutor actually made of the evidence suggest any viable theory of admissibility. That Janet might have been "the woman who set the defendant up with her own daughter" was plainly inadmissible to attack or support her credibility. (Evid. Code, § 787.) That what Eldridge said to Grace "fits into exactly" what Eldridge may later have done to Elizabeth by no means elevates Grace's testimony above proof of criminal predisposition. And surely the prosecutor's bald suggestion to the jury that Grace's experience demonstrated Eldridge's predilection for women who are "weak to begin with" simply emphasizes the People's reliance on the fallacious premise that Grace's testimony could come in to prove no more than that Eldridge was a sexual predator.

In this court the People substantially shift their legal ground. They argue, in the alternative, (1) that Grace's testimony was relevant to prove that Eldridge intended to kidnap Elizabeth and to hold her in captivity while he assaulted her sexually; (2) that the evidence was relevant to impeach, by direct rebuttal, Janet's various denials (a) of participation in sexual schemes with Eldridge and (b) of having set up Grace to have sex with Eldridge; and (3) that even if the evidence was not relevant its admission was harmless error.

It cannot be error to admit admissible evidence: So long as the evidence was in fact admissible, it is of no moment that in the trial court the proponent never called out the pertinent

theory of admissi_ _ity. But the People's ne theories are by no means dispositive.

The People's first hypothesis appears to be that because Eldridge told Grace that had he been determined to have sex with her he "would have put something in your drink," it may be inferred from evidence that Eldridge did put something in Elizabeth's drink that Eldridge was determined to have sex with Elizabeth and, further, to do whatever was necessary to achieve that goal. The hypothesis is weakened by its dependence on an assumption that Eldridge's statement to Grace was something more than mere talk. The orthodox example of admissible prior conduct, particularized to this case, would be one in which it could be shown that on one or more previous occasions Eldridge had in fact achieved illicit sexual goals by doping the victims' drinks. (Cf., e.g. People v. Robbins, supra, 45 Cal.3d 867, 879-880, citing 2 Wigmore, Evidence (Chadbourn rev. 1979) § 302, p. 241.) A secondary difficulty with the People's hypothesis is that there was no real need for Grace's obviously prejudicial testimony to prove the element of Eldridge's intent to kidnap Elizabeth and to imprison her for sexual purposes: Arguably the evidence was no more than cumulative on these narrow intent issues. (Cf. People v. Thompson, supra, 27 Cal.3d 303, 318.) Eldridge's defense was that he had sufficient reason to suppose that Elizabeth was a prostitute and that their sexual activities would amount to no more than a commercial transaction. Were the jury to reject this explanation for Eldridge's admitted sexual activities with Elizabeth, it would find ample evidence, quite apart from Grace's testimony, to prove intent and every other

element of each of the charges arising out of the episode.
Disposition of the charges would ultimately turn not on
Eldridge's intent but on the parties' relative credibility.

The weakness of the People's theory, on appeal, that
Grace's testimony could come in to rebut Janet's denials of
participating in sex schemes with Eldridge and, specifically, of
having set Grace up for Eldridge is that in the context of the
full record Janet's denials were essentially collateral matters,
not directly involved in the issues of Eldridge's guilt or
innocence. Impeachment on collateral matters is not impermissible
(cf. generally 3 Witkin, Cal. Evidence (3d ed. 1986) §§ 1982-1995,
pp. 1939-1955), but it is at best problematic whether the
probative force of the collateral impeachment in this case could
rationally be said to outweigh its manifest tendency to prejudice
the defense.

We perceive one narrow theory of relevance that the People
have not pursued either in the trial court or here:  The
inference, available from Elizabeth's testimony, that Eldridge
had in fact doped her soda was at once damning and consistent
with other details of Elizabeth's frightening account. Eldridge
could have been expected to deny that he had doped the drink, and
in fact he ultimately did so. In this light Grace's testimony,
insofar as it tended to suggest that Eldridge was at least aware
of the concept of doping a victim's drink, had some tendency in
reason to support the credibility of Elizabeth's account (and, by
the same token, to devalue Eldridge's denial). Evidence relevant
to credibility is by definition relevant evidence. (Evid. Code,
§ 210.)

32

Grace's test .ony was at best only marg ally relevant.
Its obvious substantial potential for prejudice to the defense
argued strongly for its exclusion.

But the potential prejudice was manifestly no more than
cumulative of that which inevitably arose from other, legitimate,
evidence. Every inference that might have been drawn from
Grace's testimony was already available: Grace's brief testimony
added little of weight to the irresistible perception that unless
Eldridge's various stories could be believed then he was indeed a
chronic abuser of women. In relative terms the testimony was
innocuous: Eldridge committed no apparent crime against Grace,
who apparently was able to extricate herself simply by refusing
his overtures. The trial court could properly have admitted
Grace's testimony for such limited probative force as it might
have. In any event, any arguable error was harmless and there
was no miscarriage of justice. (Cf. Evid. Code, § 353, subd. (b).)

### d. Due Process

On the basis of the conclusions we have stated we reach the
further conclusion that the cumulative effect of the enumerated
evidentiary rulings did not amount to a denial of Eldridge's due
process rights. We are satisfied that Eldridge received a fair
trial.

### 3. Sentencing

After the jury returned its verdicts the probation
department prepared a report that recommended in strong terms
that Eldridge be severely punished. Among other things the

report concluded t' : under subdivision (d) of Penal Code section
667.6 the court would be required to impose full separate
consecutive terms for all of the sex crimes of which Eldridge
stood convicted. In remarks at the sentencing hearing the
prosecutor agreed with the probation officer that "the court has
no discretion but to sentence this man consecutively . . . ."

The court announced its intention "to follow the
recommendation of the probation officer," and called upon the
probation officer to set forth the recommendations. As the
probation officer did so, including recommendations for full
consecutive terms for each of the sex crimes, the court
occasionally interjected to adopt individual recommendations.  At
the conclusion of the probation officer's reading the court
said:  "Let me say I am in agreement fully with the
recommendation that probation has made in this case.  I think
that the evidence during the trial warrants the full and
consecutive sentencing."

Citing this court's opinion in People v. Fernandez (1990)
226 Cal.App.3d 669, 678-679, and asserting a number of sentencing
errors recommended in the probation report and adopted by the
court, Eldridge argues that it was error for the trial court to
sentence him by what "amounted to an incorporation of the
probation report . . . ."  Among other things Eldridge asserts
that to impose mandatory consecutive sentences under subdivision
(d) of section 667.6 the trial court had "fact finding
obligations" that simple incorporation of the probation report
did not discharge.  Separately, Eldridge argues that the record
contains no substantial evidence to support findings, essential

34

667.6 as to sex crimes committed against a single victim, that the crimes had occurred on separate occasions.

The People concede Eldridge's last point: "Although two victims were involved and clearly some of the offenses occurred on 'separate occasions,' the record does not demonstrate the sequence of events with sufficient detail to show all of the sex offenses fell within subdivision (d). Since the present record does not establish when each sex offense occurred during the periods of captivity it is not possible for this court to agree that each offense occurred on a separate occasion. Accordingly, the case must be remanded for resentencing."

The People's concession is appropriate. (Cf. People v. Corona (1988) 206 Cal.App.3d 13, 17-18.) In light of it we perceive no need to address in detail the additional sentencing errors Eldridge asserts.

The adjudications of guilt are affirmed. The sentence is vacated, and the matter is remanded for complete resentencing in accordance with law.

_____
Bamattre-Manoukian, J.

WE CONCUR:

_____
Premo, Acting P.J.

_____
Elia, J.

PEOPLE V. ELDRIDGE
No. H008751

[CCP Sec. 1013a(2)]

The undersigned certifies that he is an active member of the State Bar of California, not a party to the within action, and his business address is 2054 University Ave., Suite 501, Berkeley, California; that he served a copy of the following documents:

PETITION FOR REVIEW

by placing same in a sealed envelope, fully prepaying the postage thereon, and depositing said envelope in the United States mail at Berkeley, California on June 15, 1993, addressed as follows.

California Court of Appeal
Sixth Appellate District
333 W. Santa Clara St., Ste. 1060
San Jose, CA  95113

Attorney General
6000 State Bldg.
San Francisco, CA  94102

SDAP
100 N. Winchester Blvd., Rm. 310
Santa Clara, CA  95050

District Attorney
70 West Hedding St.
San Jose, CA  95110

Superior Court
191 N. First St.
San Jose, CA  95113

Harry Eldridge
H-06424
P.O. Box "W"
Represa, CA  95671

Mark D. Greenberg
Attorney at Law

EXHIBIT "K"



IN THE SUPERIOR COURT OF THE

STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                )
           PLAINTIFF, )   REPORT OF
                )  PROBATION OFFICER
     vs.         )  No.: 142464
                )  July 26, 1991
HARRY LEE ELDRIDGE,  DEFENDANT, )  L. Darling, D.A.
                )  R. Cherrington, Atty.
                )
                )
                )

## COURT DATA

SENTENCING COURT:  Honorable John Schatz

COURT OF CONVICTION:  Honorable John Schatz

CHARGE:

Count Four, Section 245(a)(1) of the Penal Code (Assault with a
   Deadly Weapon -- Other than a Firearm, to wit: a Flashlight)

Personal Use of a Deadly and Dangerous Weapon within the meaning of
Sections 667 and 1192.7 of the Penal Code (Serious Felony), found
true

Counts Five, Six, Thirteen, Fourteen & Fifteen, each Section 261(2)
   of the Penal Code (Rape)

Counts Seven, Eight, Twenty, Twenty-One & Twenty-Two, each Section
   288a(c) of the Penal Code (Oral Copulation by Force)

Counts Nine & Sixteen, each Section 136.1(c) of the Penal Code
   (Dissuading a Witness - Force)

Count Ten, Section 236/237 of the Penal Code (False Imprisonment)

Count Eleven, Section 245(a)(1) of the Penal Code (Assault with a
   Deadly Weapon -- Other than a Firearm, to wit: a Sword)

Personal Use of a Deadly and Dangerous Weapon within the meaning of
Sections 667 and 1192.7 of the Penal Code (Serious Felony), found
true

Count Twelve, Section 245(a)(1) of the Penal Code (Assault with a
   Deadly Weapon -- Other than a Firearm, to wit: Fists)

**000344**

In the Case of:  HARRY LEE ELDRIDGE
Charge:  2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464                                            July 26, 1991

Count Nineteen, Section 236/237 of the Penal Code (False Imprison-
ment)

DATE OF OFFENSE:

(Counts Four, Five, Six, Seven, Eight, Nine & Ten)

Between March 1, 1990 and March 31, 1990

(Counts Eleven, Twelve, Thirteen, Fourteen, Fifteen, Sixteen,
Nineteen, Twenty, Twenty-one and Twenty-two)

Between August 1, 1990 and August 31, 1990

DATE OF ARREST:  August 24, 1990 (SJPD)

CONVICTION:  Found Guilty by Jury Verdict on May 3, 1991

CONDITIONS:  None

REMAINING CHARGES:

Ct. 1, Sec. 236/237 PC (False Imprisonment), Ct. 2, Sec. 288a(c)
PC (Oral Copulation - Force), Ct. 3, Sec. 245(a)(1) PC (Assault
with Deadly Weapon -- Other than Firearm, to wit: a Sword), w/
personal use of Deadly and Dangerous Weapon w/in mean of Sec.
667 & 1192.7 PC, Ct. 17, Sec. 207(a) PC (Kidnapping), Ct. 18,
Sec. 203 PC (Mayhem - General), found not guilty by jury verdict

DAYS IN CUSTODY:  337 actual days, 168 days - 4019 PC, 505 total
                  days; presently in custody

AGE & DATE OF BIRTH:  40; November 3, 1950; IN

CODEFENDANTS & STATUS:  None

SUPPLEMENTAL INFORMATION:

The defendant is scheduled for a Violation of Probation Hearing
on July 18, 1991 involving Information Number 134768.  In that
case, the defendant was originally granted three years Formal
Probation following a conviction of Section 11377(a) of the
Health & Safety Code (Possession - Controlled Substance).

**000345**

In the Case of:  HARRY LEE ELDRIDGE
Charge:  2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464                                    July 26, 1991

SUMMARY OF OFFENSE:

(Counts Four through Ten)

Source:   San Jose Police Department Crime Report Number
          90-662-0195.

Between March 1, 1990 and March 3, 1990, thirty-four-year-old
Kathryn J. was held against her will, beaten, and sexually
assaulted by the defendant, an acquaintance.

At the time of the report, on March 3, 1990, police noticed the
victim had a cut on the back of her head which required medical
attention.  She also appeared to have been tied up as she had red
marks on both wrists.  The victim had visible scratches and
abrasions on her face and neck and had bruises and a large welt
on her back.

The victim told police she went with the defendant and his
girlfriend on March 1, 1990, to "party."  Suddenly, the defendant
"went off" and attacked her.  The victim said the defendant kept
calling her a "stupid bitch" and said she was "spaced out."

It should be noted the victim was reluctant to talk with police
and had to be encouraged to submit to sexual assault examination.

Following the sexual assault examination, police talked with the
victim again.  At that time, she related the defendant picked her
up Thursday night at approximately 10:00 p.m.  He said he had to
go home to pick up his girlfriend and was going to turn himself
into the jail staff at Elmwood to serve a sentence on a crime he
had previously committed.  When they got to the defendant's home,
the victim, defendant, and his girlfriend began to "party."
During the party, the defendant took the victim into his bedroom
allegedly to show her his guitar.  At that point, he pulled out a
"hype kit" and "shot" the victim with some crystal
methamphetamine.  He also injected himself with the drug.

The victim said she got very high from the drug and lost the
sensation of feeling and awareness of time.  She has a vague
recall that the bruises on her back occurred when the defendant
hit her with a framing hammer.  Further, he injected
methamphetamine more than once, but the victim could not recall
how many times.

The defendant's girlfriend came into the bedroom and the
defendant exposed his penis to the victim and said, "suck my
cock."  The victim hesitated at which time the defendant told his
girlfriend to orally copulate him.  She did so immediately and

                          -3-

000346

In the Case of: HARK LEE ELDRIDGE
Charge: 2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464

July 26, 1991

then the defendant ordered the victim to do the same.  When she
said, no, the defendant slapped her on the face.

Sometime later the defendant made the victim take off her clothes
and lie on her back in the kitchen with her leg propped up
against the wall.  He tied her wrists and ankles with some type
of cord and looped the cord from her ankles to her hands and let
her lie there for a while.  He would occasionally walk up to the
victim and step on her stomach or slap her.

A short while later while the victim was still tied, the
defendant put a wash cloth into her mouth and secured it by
wrapping tape all around Kathryn's head.

Sometime later the defendant untied the victim and took her into
the bathroom.  He again exposed his penis and told her, "get down
on your knees."  At that time the victim complied and knelt down
orally copulating the defendant for approximately forty-five
minutes.

The victim tried to escape out the front door thinking the
defendant had fallen asleep.  However, he caught her and blocked
the door.  She tried to jump out a window, but the defendant
grabbed her.  He hit her on the head with a metal flashlight and
hit her on the back with a hammer.  The victim's head began
bleeding profusely.

Kathryn told police the defendant had sexual intercourse with her
more than twice, but she did not know the exact number of times.
The sexual intercourse took place on the floor of the bedroom.

The victim recalled that while she was tied up in the kitchen,
naked, the defendant's girlfriend's fourteen-year-old son walked
in.  The defendant asked the boy what they should do with her,
but the boy did not respond.

Later when the defendant did fall asleep, the victim wrapped a
blanket around her body and ran out of the house.  She was picked
up by an unidentified male who took her home.

Police took the victim in the field to see if she could locate
the defendant's home.  She pointed out a home which looked
familiar and police ran car registrations on the vehicles parked
in front.  The defendant's girlfriend's vehicle was in the
driveway, but the defendant's car was not there.

In a later interview, the victim estimated, conservatively, that
during the three days she was held captive she, at least twice
daily, was raped by the defendant, forced to orally copulate him
and raped with a foreign object (finger).

-4-

**000347**

In the Case of:  HARRY LEE ELDRIDGE
Charge:  2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464 _____                    July 26, 1991


Kathryn said she did not want to testify against the defendant as
she feared he might harm her family.


(Counts Eleven through Sixteen, Nineteen through Twenty-two)

Source:  San Jose Police Department Crime Report Number
         90-236-0379.

On August 24, 1990, fourteen-year-old Elizabeth S. reported she
was falsely imprisoned by the defendant who injected her with
methamphetamine and forced her to take off her clothes and
masturbate while he took photographs. Additionally, he forced
her to have sexual intercourse, orally copulate him, and he
sodomized her. He beat the victim with a closed fist and kicked
her in the stomach. He choked Elizabeth and refused to give her
food during the four days he held her captive. Defendant
Eldridge inserted a safety pin into the nipple of the victim's
left breast and put an earring into the opening. The defendant
told Elizabeth if she did not comply he would kill her, her
mother, her boyfriend, and set fire to her grandmother's home
(where the victim resides).

The victim elaborated telling police on August 20, 1990,
somewhere around 11:30 a.m., the defendant came to her home as
they were going to attend a movie together. She had met him two
to three weeks prior and gone for a ride with him in his car.

On the way to the movies, the defendant took the victim to a
small convenience store and purchased a "Jolt" cola. He opened
the drink before he got back to the vehicle and gave it to
Elizabeth to drink. After she consumed the beverage, she started
feeling sick. She said she felt as if she was having a heat-
stroke. He took her back to his home and took her into his
bathroom which is connected to the bedroom and injected her with
an unknown substance against her will. Elizabeth said she
immediately felt her veins burn, her lungs felt like they would
collapse and there was a sour taste in her mouth. She felt
intoxicated. It was at this time the defendant forced her to
undress and masturbate while he took photographs of her.

During that same evening, the defendant took Elizabeth for a ride
in his car claiming he would take her home. He then added a
stipulation that she would have to orally copulate him before he
took her home. She complied and, the defendant said, "You're not
going home until I say I'm done with you." He then drove back to
his home and forced the victim to have sexual intercourse with
him.

**000348**

In the Case of:  HARRY LEE ELDRIDGE
Charge:  2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464 _____                    July 26, 1991

Over the next few days, the defendant continued to forcibly
inject the victim with a narcotic substance, raped her, forced
her to orally copulate him, and beat her. At night she was bound
with black tape and her mouth was taped shut.

The victim told police the defendant was actually a friend of her
mother's. When she had met him several weeks before the assault
he was very nice to her and let her drive his car for a couple
hours.  He did not try anything sexual with her and she was not
suspicious of him in any way.  Thinking back on it, she believed
when he picked her up the day the assault began and handed her
the open can of soda, she believed he must have put something in
the drink to make her ill so he could take her home.

Police had the victim roll up her sleeve and they saw four
injection marks centered over her veins.  She elaborated stating
the defendant got a hypodermic needle and spoon out of the
bathroom cabinet and took some white powder and put it on the
spoon.  He then mixed some water and the powder and injected the
victim.

The victim said a short time after she was injected with drugs, a
lady with blonde hair walked into the room and orally copulated
the defendant.  When the woman left, the defendant grabbed
Elizabeth by the throat and started choking her.  He told her,
"you came here because you wanted to suck my dick."  The victim
feared the defendant was going to kill her.

The defendant then put on a pornographic movie and took off all
his clothes.  He ordered the victim to take her clothes off and
she complied as she feared he would beat her up.  He then started
masturbating and grabbed her by the hair making her suck on his
penis.  He then hit the victim in the head repeatedly and
inserted his penis into her vagina.                            --

The victim stated the defendant injected her with more drugs late
Monday night.  They stayed up all evening and he took nude
pictures of her and forced her to have sex with him an unknown
number of times.

Later in the evening, another woman came in and asked the
defendant if this was the same girl as before.  He said no and
ordered the girl to perform sexual acts with the victim.
Elizabeth said the girl came over and sucked on her nipples and
as she started to have oral sex with her, Elizabeth pulled away.
The defendant then handcuffed Elizabeth and tied up her legs.
She spent the night that way in the bathroom.

The following morning, the defendant woke up and accused the
victim of taking his drugs.  He threatened he would kill her if

                         - 6 -                          000349

In the Case of:  HARRY LEE ELDRIDGE
Charge:  2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464                                            July 26, 1991

he found she had done this.  She told the defendant she was tied
up all night and could not have taken his drugs.  He told her he
was just kidding and untied the victim, injecting her again with
drugs.  He attempted to have anal intercourse with the victim,
but it caused her too much pain.  He also wanted to use a dildo,
but she told him no.  She said he told her "I'm your master,
you're my slave."

On Thursday, the defendant took a large sword and put it to the
victim's throat.  He got some black, sticky tape and taped
Elizabeth's eyes, mouth, hands, and legs.  He then removed the
tape from her eyes and said, "I want you to watch yourself die."
He started to choke the victim and asked, "Are you going to tell
me who took the drugs?"

The defendant then handcuffed the victim and dragged her to his
car.  He drove to an unknown area and threw her out of the
vehicle taking the handcuffs off her.  Once she was on the
ground, he said, "This is what you deserve cunt."  He then kicked
the victim several times in the stomach.  He reached down and
punched her in the head and said if anyone found out about what
happened he would blow up her grandmother's house and kill them
all.  He left her there and she was able to loosen the tape on
her hands and get free.  She hitch-hiked a ride and when she
arrived at a friend's home contacted her grandmother and uncle.
Her uncle contacted the police.

In further discussion with the victim, police learned the
defendant while at his home, inserted a safety pin into the
victim's nipple on her left breast.  He put an earring into the
nipple.  Further, during this ordeal, during the four days the
victim was held against her will, she was only given two bananas
and one glass of milk.

Police learned the defendant's identity and placed him under
arrest.  They learned the defendant was on probation for drug
offenses.  Further, he had a search clause as a condition of his
probation contract.  During the arrest procedure officers saw in
plain view, a roll of black tape, pieces of discarded tape with
brown hair stuck to it, an oriental sword, and a television with
pornographic tapes.

Following his arrest on August 24, 1990, police brought the
defendant to the Sexual Assault Unit for interview.  Prior to
police entering the interview room, but while the tape was
running, the defendant was talking to himself.   Defendant
Eldridge stated, "I'm getting beat up by a little girl, son-of-a
bitch!"

-7-

000350

'In the Case of:   HARRY LEE ELDRIDGE
Charge:   2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464                                              July 26, 1991

The defendant wanted to talk with police, "informally, off the
record."  When the officer said there was no such thing as "off
the record" the defendant then stated he would be crazy to talk
without an attorney.  He then made unsolicited comments stating
he did nothing to hurt the victim.  He said she told him she was
beaten up and left for dead under a bridge near Willow Street.

For the next five minutes, the defendant sat in a room alone
talking to himself.  He rambled on about being, "set up" he
implied the victim's grandmother was working her out of a "Whore
House."

As the defendant was taken to the inside lower booking at the
main jail, he spontaneously stated he did not do anything the
victim did not want to do.  He was given a copy of the booking
sheet and after seeing the charges stated, "This is more serious
than I thought."

VICTIM'S STATEMENT:   (Appearance Unknown)

Both victims were sent written notification of these proceedings
and their rights pursuant to Section 1191.1 of the Penal Code.
Telephone contact was made with each victim and a personal
interview was requested.

Kathryn refused to meet with the undersigned officer indicating
she was tired of this whole thing and wanted it over.  She said,
"He is sick and I want him locked up."  She described the
defendant as a "small time Manson."

An interview was scheduled with Elizabeth, but when the
undersigned arrived, the victim was not at home.

With the assistance of the investigating police officer, the
undersigned made telephone contact with Elizabeth on July 12,
1991.  She indicated a desire to have the defendant confined for
a lengthy prison term with the hopes he would die during his
imprisonment.  She feels he is an evil man who presents a danger
to women.

DEFENDANT'S STATEMENT:   (Requested - Not Received)

The defendant began the interview by declaring his innocence.  He
feels he was "set up" by Elizabeth's grandmother.  He said he had
just called her to get a "hooker" for the night.  Elizabeth's
mother was in jail, so her grandmother "sold" her to the
defendant.

-8-

000351

In the Case of: HARRY LEE ELDRIDGE
Charge: 2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464                                                July 26, 1991

Defendant Eldridge said Elizabeth had a "mental breakdown" while
she stayed with him. It is not his habit to have sex with
children. Thus, in the three days he spent with her he tried to
help her. He said, "I've always tried to help children. I
tutored my last girlfriend's son who was dyslexic and got him up
to grade level."

In regard to the victim Kathryn, the defendant said he never had
sex with her. He said, "she was so out of it, she left nude.
Maybe the guy who picked her up did bad things to her, but not
me."

The defendant acknowledged he had a drug problem in the past.
However, he refused to discuss the specifics of his use/abuse.
He said he has been "cleaned up" since 1986 and is very proud of
himself. He said he did not have to go to a program or anything
which shows what a strong person he is. So, the claims from the
victim that he gave them drugs is a lie.

In discussing his life, the defendant said, "I had a beautiful
childhood. My father always took care of me. Anyone who knows
me, knows this is not me." The defendant hopes the Court will
review his arrest history which he claims is inconsistent with a
man who rapes.

It was the defendant's statement he has lost faith in the
"system" since he was found guilty of these horrible crimes. He
expressed disappointment in the District Attorney and said, "She
knows better, she knows I'm not guilty. She must be crusading
for something, women's lib or whatever. I've been praying for
her ever since I figured this out."

The defendant does not want to spend the rest of his life in
prison. He hopes the verdict will be overturned during the
appeal process and the truth will set him free.

INTERESTED PARTIES:

Since he was first arrested in 1972, the defendant has
accumulated four misdemeanor and one felony convictions. His
only grant of Formal Probation involves the Violation of
Probation matter alluded to in Supplemental Information.

-9-

**000352**

In the Case of:  HARRY LEE ELDRIDGE
Charge:  2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464                                       July 26, 1991

| DATE- | DKT #/<br>INFO # | CHARGE: | DISPOSITION: |
|-------|--------|---------|--------------|
| 1/11/90 | 134768 | 11377(a) H&SC | 3 yrs prob; 4 mos CJ, $100RFF. $100DPF; S&S; Chem Test; Jail term stayed 5/1/90 |

Numerous character reference letters have been submitted by
friends and family attesting to the defendant's good qualities.


DISCUSSION:

Judicial Council Rules 414, 421 & 423:  (Attached)

Enhancements:  (None)

Case Evaluation:

Harry Lee Eldridge is a forty-year-old man who appears for
sentencing on multiple sex, assault, and false imprisonment
charges.  The defendant was serving felony probation for drug
charges at the time he was arrested.

The defendant is a single man who graduated from Camden High
School in 1969.  He has been self employed for the past six years
in "Design Electronics."

The defendant's sadistic and barbaric attack on these women,
demonstrates he poses a significant threat to the community.  He
drugged them, beat them, and sexually assaulted them while
holding them for days against their will.  He tied them with
cords and taped their eyes and mouths closed.

One of the victims so feared for her life she left the
defendant's home wrapped only in a blanket.  The teenage victim
was left tied up near a creek, presumably to die.

Both victims were threatened that they and their loved ones would
be harmed and killed if the police learned what the defendant had
done.

Defendant Eldridge's crimes are not only vicious, but evil.  He
seems to be a man without a conscience.  He is a man who cannot
be allowed the opportunity to plan and calculate similar crimes
in the future.  He must be held in a secure setting for a
significant number of years as allowed by statute.

**000353**

In the Case of:  HARRY LEE ELDRIDGE
Charge:  2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464                                         July 26, 1991

The defendant is ineligible for probation pursuant to Section
1203.065(a) of the Penal Code.  Given the nature of the crimes,
probation would not be considered in any event.

The aggravated terms are recommended as the manner in which the
crimes were carried out indicates planning, sophistication, or
professionalism.  Further, the defendant was on probation at the
time the crimes were committed and the victims were particularly
vulnerable in that they were drugged and bound unable to escape
the assaults.

Full term consecutive sentencing is mandated pursuant to Section
667.6(d) of the Penal Code in Counts Five through Eight, Thirteen
through Fifteen and Twenty through Twenty-two as the crimes
involved different victims and the multiple crimes as to each
individual victim were committed on separate occasions as "the
defendant had a reasonable opportunity to reflect upon his
actions and nevertheless resumed sexually assaultive behavior."
(Judicial Council Rule 426)

Full Midterm consecutive sentencing on the Dissuading a Witness
charges are mandated pursuant to Section 1170.15 of the Penal
Code.  Even if not mandated, said sentencing would be recommended
as the crimes and their objectives were predominently independent
of each other and were committed at different times.

SUGGESTED TERM:

| CRIME | MIT | AGG | RANGE | ENHANCEMENT | TOTAL TERM |
|-------|-----|-----|-------|-------------|------------|
| Ct. 4,<br>245(a)(1) PC | No | Yes | 2,3,4 yrs | None | 4 yrs |
| Ct. 9,<br>136.1(c) PC | No | Yes | 2,3,4 yrs | None | 3 yr c/s<br>(1 yr stayed) |
| Ct. 16,<br>136.1(c) PC | No | Yes | 2,3,4 yrs | None | 3 yrs c/s<br>(1 yr stayed) |
| Ct. 11,<br>245(a)(1) PC | No | Yes | 2,3,4 yrs | None | 4 yrs c/c |
| Ct. 12,<br>245(a)(1) PC | No | Yes | 2,3,4 yrs | None | 4 yrs c/c |

-11-                                                    **000354**

In the Case of:  HARRY LEE ELDRIDGE
Charge:  2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464                                                July 26, 1991

Ct. 10,
236/237 PC             No   Yes   16 mos,
                                  2,3 yrs        None        3 yrs c/c

Ct. 19,
236/237 PC             No   Yes   16 mos,
                                  2,3 yrs        None        3 yrs c/c

                       TOTAL TERM PER SEC. 1170.1 PC        10 yrs


Ct. 5,
261(2) PC              No   Yes   3,6,8 yrs      None        8 yrs c/s

Ct. 6,
261(2) PC              No   Yes   3,6,8 yrs      None        8 yrs c/s

Ct. 7,
288a(c) PC             No   Yes   3,6,8 yrs      None        8 yrs c/s

Ct. 8,
288a(c) PC             No   Yes   3,6,8 yrs      None        8 yrs c/s

Ct. 13,
261(2) PC              No   Yes   3,6,8 yrs      None        8 yrs c/s

Ct. 14,
261(2) PC              No   Yes   3,6,8 yrs      None        8 yrs c/s

Ct. 15,
261(2) PC              No   Yes   3,6,8 yrs      None        8 yrs c/s

Ct. 20,
288a(c) PC             No   Yes   3,6,8 yrs      None        8 yrs c/s

Ct. 21,
288a(c) PC             No   Yes   3,6,8 yrs      None        8 yrs c/s

Ct. 22,
288a(c) PC             No   Yes   3,6,8 yrs      None        8 yrs c/s

                       TOTAL TERM PER SEC. 667.6(d) PC      80 years

                                          TOTAL TERM;       90 years

-12-

000355

In the Case of: HARRY LEE ELDRIDGE
Charge: 2 cts: 245(a)(1) PC, 5 cts:
261(a) PC, 5 cts: 288a(c) PC, 2 cts:
136.1(c) PC & 236/237 PC
Info. No.: 142464

July 26, 1991

RECOMMENDATION:

1. Probation be denied.

2. The defendant be committed to the California Department of Corrections for ninety (90) years.

3. The defendant be advised of a subsequent three (3) year period of Parole Supervision.

4. A fine of $100 be imposed pursuant to Section 290.3 of the Penal Code.

5. A Restitution Fine of not more than $10,000.00 be imposed pursuant to Section 13967 of the Government Code.

6. Restitution as determined by the Court.

NOTE: Attorney's fees if appropriate.

Respectfully submitted,

PEDRO R. SILVA, Chief
Probation Officer

Diana Cunningham, Deputy
Probation Officer

DC/ng
Attachments

Reviewed by:

James W. Grubbs
Supervising Probation
Officer - Ext. 2137

The above report has been read and considered by the Court.

JOHN SCHATZ
Judge of the Superior Court
Santa Clara County, California

-13-

000356

## SOCIAL DATA

NAME: HARRY LEE ELDRIDGE          DATE: 7/26/91   #'(s): 142464

AGE: 40    DOB: 11/3/50       PLACE OF BIRTH: Indiana

CITIZENSHIP: U.S.A.          ALIEN REGISTRATION #: N/A

SEX: Male    HEIGHT: 6'0"    WEIGHT: 200    HAIR: brn    EYES: brn

LENGTH OF RESIDENCE IN USA: Life    CALIF: 38 yrs   S. CLARA CO: 38 yrs

CURRENT ADDRESS: 5179 Derek San Jose, CA

RESIDES WITH: Janet Victoria          TELEPHONE: None

ADDRESS AT TIME OF OFFENSE: same

EDUCATION: Grade Completed: 12th  Date: 1969    Degrees: HSD
           School: Camden HS

| PARENTS | Name | City & State of Residence | Telephone No. |
|---------|------|---------------------------|---------------|
| Father: | Harry Eldridge | deceased 1976 | |
| Mother: | Bobbie Eldridge | unknown | |
| Stepfather: | | | |
| Stepmother: | | | |

BROTHERS & SISTERS:

| Name: | Age: | Sex: | City & State of Residence: |
|-------|------|------|----------------------------|
| Shiela | 42 | F | Lodi, CA |
| Merlin | 20 | F | deceased (drowned 1975) |

MARITAL STATUS: (Include Common-Law): Single
Spouse's Name:                    Age:        Date of Marriage:
Address:                                      Telephone:

PREVIOUS MARRIAGES: (Include Common-Law):

| Name: | Dates: | Comments: |
|-------|--------|-----------|
| None | | |

CHILDREN:

| Name: | Other Parent: | Age: | Sex: | Lives With: | Supported by: |
|-------|---------------|------|------|-------------|---------------|
| None | | | | | |

EMPLOYMENT/FINANCIAL STATUS

NAME:   HARRY LEE ELDRIDGE                    DATE:   7/26/91   #(s):   142464

EMPLOYMENT HISTORY:   (Listed most recent to least recent)

Employer:   Self Employed                    Dates:   6 yrs
City & State:                                Salary:   Varied
Reason for Leaving:                          Occupation:   Design Elec

Employer:   Dean Markcey                     Dates:   1986
City & State:   Santa Clara, CA              Salary:   $1000/wk
Reason for Leaving:   quit - no pay          Occupation:Market Survey

Employer:                                    Dates:
City & State:                                Salary:   $
Reason for Leaving:                          Occupation:

Employer:                                    Dates:
City & State:                                Salary:   $
Reason for Leaving:                          Occupation:

Employer:                                    Dates:
City & State:                                Salary:   $
Reason for Leaving:                          Occupation:

Employer:                                    Dates:
City & State:                                Salary:   $
Reason for Leaving:                          Occupation:

TRAINING PROGRAMS                                              Certificate
Program:                        Dates:                         of Completion
Santa Clara City College        1978                           yes
(Blueprint/Sheetmetal)

UNION AFFILIATION:   None
                     Apprenticeship?   N/A    Journeyman?   N/A

MILITARY SERVICE:
Branch:               Dates:        Type of Discharge   Rank Achieved:
None                                                        --

PRESENT INCOME:   (Gross per month)
Employment:   $  -0- (incarcerated)   Savings:   $  -0-
              Spouse's Income:   N/A
              Other (Specify):   $ -0-

MAJOR EXPENSES:
Residence:   $ -0- (incarcerated)    Living:   $ -0- (incarcerated)
Other:   $ -0-            Specify:
Vehicle #1: Amount Owed:   $         Make:   None        Lic #:
            Amount Owed:   $         Make:                Lic #:
            Amount Owed:   $         Make:                Lic #:

000358

HEALTH RECORD

NAME:  HARRY LEE ELDRIDGE              DATE:  7/26/91  #(s):  142464

GENERAL STATUS:  Good

PHYSICAL HANDICAPS:  None

SCARS, IDENTIFYING MARKS:  TT: left arm

DRUG USAGE:  (Legal and/or illegal)  Refused

ALCOHOL USAGE:  None past 15 years

PSYCHOLOGICAL/PSYCHIATRIC ILLNESS:  None

PRESENT TREATMENT PROGRAM:  None

PAST TREATMENT PROGRAM(S):  None

-------------------------------------------------------------------------------
-------------------------------------------------------------------------------

CRIMINAL RECORD DATA

CII#:  M4111793   FBI#:  109988L2    DMV#:  S0033037      CEN#:  9048261
PFN#:  ANY400     SS #:  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  and#:               and#:

RECORDS  (Indicate if Attached, Requested or None)

Juvenile:  N/A  Adult:  Attached     Driving:  N/A       Other:  None

NUMBER OF PRIOR CONVICTIONS
Juvenile:  N/A          Adult Misdemeanors: 4      Adult Felonies: 1

PRIOR STATE COMMITMENTS  CYA:  0     CDC:  0     CRC:  0
    Another State?  0              Federal?  0

ON PAROLE                          ON PROBATION
Agent's Names:  N/A                Officer's Name:  R. Rebollar

OTHER MATTERS PENDING:  VOP #134768, July 18, 1991

000359

EXHIBIT "L"

No. H032586


IN THE SUPREME COURT OF THE STATE OF CALIFORNIA


HARRY ELDRIDGE,                          Docket No. _____
          Petitioner,

      v.

SUPERIOR COURT OF CALIFORNIA
FOR THE COUNTY OF SANTA CLARA,
          Respondent Court.

PEOPLE OF CALIFORNIA,
          Real Party.

_____/


PETITION FOR REVIEW


Review of Order of Denial of
Petition For Writ of Mandate
by the California Court of Appeal
Sixth Appellate District

_____


Harry Eldridge H-06424
Mule Creek State Prison
P.O. Box 409060, C-13-244-L
Ione, CA 95640


By Person In State Custody


L-1

## TOPICAL INDEX

Pages

QUESTIONS PRESENTED                                          1-2

STATEMENT OF THE CASE AND RELEVANT FACTS                    2-4

ARGUMENT                                                    5-6

   I   AN INCREASE IN THE AMOUNT OF THE ORIGINAL
     RESTITUTION FINE IMPOSED AFTER APPEAL, UPON
     RESENTENCING, VIOLATES STATE AND FEDERAL
     PROTECTIONS AGAINST DOUBLE JEOPARDY AND
     VIOLATES DUE PROCESS OF LAW.                          5

   II  A SENTENCEING COURT IS REQUIRED TO CORRECT
     AN UNLAWFUL SENTENCE ONCE THE MATTER IS
     BROUGHT TO THE COURT'S ATTENTION                      5-6

   III THE COURT OF APPEAL ABUSED IT'S DISCRETION
     IN DENYING PETITIONER'S PETITION FOR WRIT
     OF MANDATE.                                           6

CONCLUSION                                                  6

REQUEST FOR JUDICIAL NOTICE                                 6-7

CERTIFICATE OF COMPLIANCE                                   7

## TABLE OF AUTHORITIES

### Cases:

Cunningham v. California
549 U.S. ____ (2007), 166 L.Ed.2d 856                        3

People v. Chagolla (1983)
144 CA3d 422                                                 5

People v. Hanson (2000)
23 Cal.4th 355                                              5

People v. Henderson (1963)
60 Cal.2d 482                                               5

People v. Scott (1994)
9 C4th 331                                                  5

People v. Superior Court (Oliver) (1933)
135 CA 562                                                 5

### Federal Constitution

5th and 14th Amendments                               passim

2-2

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

HARRY ELDRIDGE,
      Petitioner,

    v.

SUPERIOR COURT OF CALIFORNIA
FOR THE COUNTY OF SANTA CLARA,
      Respondent Court.

PEOPLE OF CALIFORNIA,
      Real Party.

_____/

Docket No. _____

No. H032586
(Santa Clara County
Super. Ct. No. 142464)

## PETITION FOR REVIEW

.  .  .

TO THE HONORABLE CHIEF JUSTICE AND ASSOCIATE JUSTICES OF
THE SUPREME COURT:

Pursuant of rule 28 of the Rules of Court, Petitioner,
Harry Eldridge, respectfully petitions the Court to review the
decision of the Court of Appeal, Sixth Appellate District, filed
February 15, 2008 denying petitioner's Petition For Writ Of Mandate
directed to the Superior Court of California For the County of
Santa Clara seeking to compel the court to correct an unauthorized
sentence.

Petitioner's case raises important questions of federal and
state constitutional law:

1.   Does an increase in the amount of the original restitution

1.

L -3

fine imposed after appeal, at resentencing, violate state and federal protections against double jeopardy and violate due process?

2.   Is a sentencing court required to correct an unlawful sentence once the matter is brought to the Court's attention and does failure to do so violate a defendant's state and federal right to due process of law?

3.   Did the Court of Appeal abuse it's discretion by denying Mandate?

## STATEMENT OF THE CASE AND RELEVANT FACTS

On January 4, 1991 an Amended Information was filed in case number 142464 in the Santa Clara County Superior Court charging Petitioner with several counts of forcible rape, oral copulation and assault. (Penal Code Sections 261(2), 288a(C), and 245(a)(1)) Petitioner began trial on April 18, 1991. On May 3, 1991 the jury returned a verdict of acquital on several counts and guilty on the remaining counts. On July 26, 1991 Petitioner was sentenced to an aggregate term of 90 years in prison and ordered to pay a Restitution Fine in the amount of $100.00.

An appeal followed in the Sixth Appellate District. (H008751) That Court affirmed the conviction but remanded the case for re-sentencing; the trial court erred in the sentencing of certain of the sexual assault counts pursuant to Penal Code Section 667.6(d).

On March 4, 1994, in the trial court, Petitioner was resentenc-ed to an aggregate term of 84 years in prison and the Restitution Fine was increased from $100.00 to $1,000.00.

A second appeal was denied in full, with the Petition to the California Supreme Court for Review being denied on March 3, 1995.

In December of 2006 Petitioner filed a Petition For Writ of

2.

$L-4$

Habeas Corpus in the trial court raising several claims of sentenc-
ing errors (Claims I-IV) and Ineffective Assistance of both trial
and appellate counsel. (Claims V. and VI.)

Although the arguments presented in Claims I and II of the
habeas corpus petition predate the decision of the United States
Supreme Courts decision in **Cunningham v. California, 549 U.S. \_\_\_\_**
**(2007), 166 L.Ed.2d 856, 127 S.Ct. 856** (decided January 22, 2007),
the thrust of the argument was essentially the same. However, in
Claim III of the habeas corpus petition (and material to the matters
addressed herein) Petitioner alleged:

> UPON RESENTENCING THE TRIAL COURT EXCEEDED
> IT'S JURISDICTION, AND VIOLATED PETITIONER'S
> STATE AND FEDERAL RIGHT TO DUE PROCESS OF THE
> LAW AND TO NOT BE PUT IN JEOPARDY TWICE FOR
> THE SAME OFFENSE.

The trial court denied the habeas corpus petition stating
that Petitioner was not entitled to relief under Cunningham  because
Petitioner's case was final prior to Cunningham's date of determina-
tion. This order is appended hereto and identified as Petitoner's
exhibit A. The order does not address Claim III of the habeas corpus
petition.

Subsequently Petitioner filed a Petition For Writ of Habeas
Corpus in the California Court of Appeal, Sixth Appellate District
(Docket No. H031358) raising the same claims as presented to the
trial court. The petition was denied on May 2, 2007. This order
of denial is appended hereto and identified as petitioner's exhibit
B. The same Claims were presented to this Honorable Court in a
Petition For Writ of Habeas Corpus (S152690) and was denied on
October 10, 2007. The Order of Denial is attached and identified

3.

$L - 5$

as Petitioner's exhibit C.

No state court responded to the claim presented in Petitioner's habeas corpus petition that the increase in petitioner's restitution fine was unlawful and violated double jeopardy. Therefore Petitioner sought remedy by filing a Notice and Motion Requesting Correction of Sentence on December 31, 2007, in the trial court. A true and corect copy of this motion is appended hereto and identified as Petitioner's exhibit D. This motion requested the correction of an unlawful sentence, which can be corrected at any time; i.e., the unlawful increase of Petitioner's Restitution Fine from $100.00 to $1,000.00 upon resentencing. This motion was denied on January 29, 2008. In it's order of denial (appended hereto and identified as Petitioner's exhibit E) the Court stated that the Claims should have been presented on direct appeal or in the habeas corpus petition previously presented to the Court of Appeal, Sixth Appellate District, in case Number H031358. (See exhibit E) The claim was presented in said petition to both the trial court and the Court of Appeal.

On February 11, 2008 Petitioner petitioned the Court of Appeal, Sixth Appellate District for a Writ of Mandate directed to the trial court to compel the trial court to perform it's duty and correct an unlawful sentence. A true and correct copy of this Petition For Writ of Mandate is Appended hereto and identified as Petitioner's exhibit F. On February 15, 2008 the petition was summarily denied. The Order of Denial is Appended hereto and identified as Petitioner's exhibit G.

4.

L-6

## ARGUMENT

I.    AN INCREASE IN THE AMOUNT OF THE ORIGINAL RESTITUTION FINE
      IMPOSED AFTER APPEAL, UPON RESENTENCING, VIOLATES STATE AND
      FEDERAL PROTECTIONS AGAINST DOUBLE JEOPARDY AND VIOLATES
      DUE PROCESS OF LAW.

This issue is not complex. Petitioner appealed his conviction.
The case was sent back to the sentencing court for resentencing
on matters not effecting the validity of the original $100.00
Restitution Fine, which was lawful at the time of original sentenc-
ing. At resentencing the court increased the Restitution Fine to
$1,000.00. This in unlawful as held by this Honorable Court in
**People v. Hanson (2000) 23 Cal.4th 355.** In Hanson this court applied
the "Henderson Rule" (**People v. Henderson (1963) 60 Cal.2d 482,**
**495-497**), to a case (Hanson) which matches the facts of this case
at all four points of the legal compass. In **Hanson, supra,** this
Court held that to increase a Restitution Fine upon resentencing
violates due process and double jeopardy.

II.   A SENTENCING COURT IS REQUIRED TO CORRECT AN UNLAWFUL SENTENCE
      ONCE THE MATTER IS BROUGHT TO THE COURT'S ATTENTION.

A Criminal defendant has a state and federal constitutional
right to a lawful sentence because the trial court has no juris-
diction to impose an unlawful sentence. There is no time limit
for correcting an unlawful sentence, which may be corrected at
any time. See **People v. Chagolla (1983) 144 CA3d 422, 433; People**
**v. Scott (1994) 9 C4th 331, 354 fn.17.** The duty to correct an
unlawful sentence is inferred in the holding of **People v. Superior**
**Court (Oliver) (1933) 135 CA 562** which states that if a sentencing

∠ - 7

court refused to correct an unlawful sentence remedy lies in a
Petition For Writ Of Mandate to the Appellate Court.

III. THE COURT OF APPEAL ABUSED IT'S DISCRETION IN DENYING PETITION-
     ER'S PETITIONER FOR WRIT OF MANDATE.

As set forth above Petitioner's only proper remedy for a trial
court's refusal to correct an unlawful sentence is to seek a writ
of mandate from the Court of Appeal to compel the sentencing court
to perform it's duty. In this instance the Court of Appeal's failure
to issue it's writ of mandate is an abuse of discretion which
denies Petitioner due process of the law is obtaining the proper
remedy of a corrected, lawful sentence.

## CONCLUSION

For the reasons set forth herein Petitioner respectfully
asks this Honorable Court to reverse the denial of the Court of
Appeal and direct it to issue it's writ of mandate to the sentencing
court to compel it to perform it's duty of correcting Petitioner's
sentence.

Or in the alternative this Court is asked to correct the error
in Petitioner's sentence on it's own motion.

The Court is further asked to provide what ever further remedy
the Court deems fit.

## REQUEST FOR JUDICIAL NOTICE

Petitioner hereby requests that this Honorable Court take
judicial notice of the record on appeal and the briefs filed and
lodged in this case, exhibits in case number H031358 and S152690.

4 -8

Additionally Petitioner requests this Court take judicial notice of all documents appended hereto as exhibits since all such documents are court records, orders, and relevant pleadings filed in this matter. (See California Evidence Code Sections 450, et seq.)

Dated: _____          Respectfully submitted,

_____
Harry Eldridge, In Pro Per

---

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 28.1 of the Rules of Court, I certify that this petition for review is proportionally spaced and contains 1,330 words by actual count.

Dated: _____

_____
Harry Eldridge

L-9

EXHIBIT "A"

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

**F I L E D**

MAR 12 2007

KIRI TORRE
Chief Executive Officer
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

In re                                    )    No. 142464
                                         )
    Harry Eldridge                       )    Order
                                         )
On Habeas Corpus                         )
                                         )
_____)

Harry Eldridge (Petitioner) has filed multiple habeas corpus petitions. In the present petition, petitioner contends he is entitled to relief under the recent case of *Cunningham v. California* (2007) 166 L.Ed.2d. 856.

Petitioner's case was final prior to *Cunningham, supra,* and *Blakely v. Washington* (2004) 542 U.S. 296. Petitioner is therefore not entitled to relief.

Accordingly, the Petition is DENIED.

Date: _12 Mar 2007_                    _____

                                       PAUL BERNAL
                                       JUDGE OF THE SUPERIOR COURT

Cc:    Petitioner
       District Attorney
       Research
       CJIC

L - 11

EXHIBIT "B"



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

MAY 2 - 2007

MICHAEL J. YERLY, Clerk

By _____
DEPUTY

In re HARRY ELDRIDGE,

on Habeas Corpus.

H031358
(Santa Clara County
Super. Ct. No. 142464)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Premo, Acting P.J., Elia, J., and Duffy, J., participated in this decision.)

Dated  MAY 2 - 2007 _____    PREMO, J. _____ Acting P.J.

L -13

EXHIBIT "C"

**S152690**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re HARRY ELDRIDGE on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

OCT 1 0 2007

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice

$L - 15$

EXHIBIT "D"



1  Harry Eldridge H-06424
   Mule Creek State Prison
2  P.O. Box 409060, C-13-244-L
   Ione, CA 95640
3
   In Pro Per
4

5

6

7

8        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF SANTA CLARA

10

11  PEOPLE OF CALIFORNIA,          Case No. 142464
                Plaintiff,
12                               NOTICE AND MOTION REQUESTING
          v.                     CORRECTION OF SENTENCE.
13
    HARRY ELDRIDGE,
14              Defendant.
    _____/
15

16

17        TO: THE DISTRICT ATTORNEY OF THE COUNTY OF SANTA CLARA

18        AND THIS HONORABLE COURT:

19        PLEASE TAKE NOTICE: that defendant, Harry Eldridge, acting

20  on his own behalf, hereby moves this Honorable Court for correc-

21  tion of an unlawful sentence, as set forth in the attached

22  Memorandum of Authorities.

23        The ground for this motion is that the increase of the

24  Restitution Fine originally imposed after direct appeal and

25  upon resentencing violates state and federal prohibitions

26  against Double Jeopardy.

27        This motion is based upon this motion, the attached

                              1.

                                        2-17

1    Memorandum of Argument and Authorities and supporting Exhibits,

2    and the entire record of this case.

3    Dated: _____          Respectfully submitted,

4

5                                     _____

6                                     Harry Eldridge, In Pro Per

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

L-18

1 | MEMORANDUM OF ARGUMENT AND AUTHORITIES

2

3 | Jurisdiction:

4 | The trial court holds jurisdiction to correct an unlawful

5 | sentence at any time the matter comes to the attention of the

6 | court. People v. Chagolla (1983) 144 Cal.App.3d 422, 434.

7 | Controlling Principal of Law:

8 | The Fifth Amendment to the Constitution of the United

9 | States and Article I, §§ 15 and 24 of the California State

10 | Constitution protest a criminal defendant from twice being placed

11 | in jeopardy. Further, the 14th Amendment to the Federal Constit-

12 | ution, and Article I, §§ 15 and 24 for the State Constitution

13 | guarantee a criminal defendant due process of the law. Federal

14 | Constitutional guarantees are attached to the States through

15 | the 14th Amendment.

16 | Relevant Facts and Argument:

17 | At the original sentencing hearing of this matter, which

18 | occurred on July 26, 1991, the defendant was ordered to pay

19 | a Restitution Fine in the amount of $100.00. (See defendant's

20 | attached exhibit A.) Upon resentencing, resulting from appellate

21 | review, the defendant was ordered to pay a Restitution Fine

22 | in the amount of $1,000.00. (See defendant's attached exhibit

23 | B.) The defendant now argues that the trial court exceeded it's

24 | jurisdiction in imposing an increased Restitution Fine after

25 | the matter was appealed and directed back to the sentencing

26 | court for resentencing on matters not effecting the validity

27 | of the original Restitution Fine imposed.

3.

Z-19

1         Purely for the sake of this argument defendant asserts

2 that the original Restitution Fine was properly imposed pursuant

3 to the law which controlled the matter during the period of

4 time effected.

5     The offenses which are the basis of the judgment in question

6 occurred in 1990. Therefore, it is the law as it existed at

7 that time which controls this matter.

8                **§ 1202.4 Restitution fine; felony convict-
                  ions; waiver; probation**

9

10          (a)   In any case in which a defendant
is convicted of a felony, the court shall

11 order the defendant to pay a restitution
fine as provided in subdivision (a) of

12 Section 13967 of the Government Code.
Such restitution fine shall be in addition

13 to any other penalty or fine imposed and
shall be ordered regardless of the defen-

14 dant's ability to pay. However, if the court
finds that there are compelling and extra-

15 ordinary reasons, the court may waive impos-
ition of the fine. When such a waiver is

16 granted, the court shall state on the record
all reasons supporting the waiver.

17 **West's California Penal Code, 1990 Compact
Edition**

18 Government Code § 13967 (a), provides:

19          (a)   Upon a person being convicted of
any crime in the State of California, the

20 court shall, in addition to any other penalty
provided or imposed under the law, order

21 the defendant to pay restitution in the
form of a penalty assessment in accordance

22 with Section 1464 of the Penal Code. In
addition, if the person is convicted of

23 one or more felony offenses, the court shall
impose a separate and additional restitution

24 fine of not less than one hundred dollars
($100) and not more than ten thousand dollars

25 ($10,000). In setting the amount of the
fine for felony convictions, the court shall

26 consider any relevant factors including,
but not limited to, the seriousness and

27 gravity of the offense and the circumstances

4.

L-20

```
 1                        of its commission, any economic gain derived
                          by the defendant as a result of the crime,
 2                        and the extent to which others suffered
                          losses as a result of the crime, Such losses
 3                        may include pecuniary losses to the victim
                          or his or her dependents as well as intang-
 4                        ible losses, such as psychological harm
                          caused by the crime, Except as provided
 5                        in Section 1202.4 of the Penal Code and
                          subdivision (c) of this section, under no
 6                        circumstances shall the court fail to impose
                          the separate and additional restitution
 7                        fine required by this section. This fine
                          shall not be subject to penalty assessments
 8                        as provided in section 1464 of the Penal
                          Code.
 9
```

10      Defendant is cognizant of the language contained in the

11 opinion of the Court of Appeal, in this matter, wherein the

12 court said: "The sentence is vacated, and the matter is remanded

13 for complete resentencing in accordance with the law", but the

14 law is clear that this statement may only apply to that portion

15 of the sentence which is unlawful. See People v. Chagolla, supra,

16 at 434; also In re Sandel (1966) 64 Cal. 2d 412, 417-419.

17      It is true that California Courts have held that a criminal

18 defendant runs the risk of having a greater sentence imposed

19 after retrial if the original sentence is either illegal or

20 unauthorized. See People v Serrato (1973) 9 C3d 753, 763. How-

21 ever, Serrato, and cased of that line of reasoning, are distinc-

22 tive in that the entire effected sentence was illegal or unauth-

23 orized. California Courts have also held that if only a portion

24 of the sentence is unauthorized only that portion may be

25 effected. See In re Sandel, supra. The sentencing court, follow-

26 ing remand for resentencing, may not increase the sentence on

27 all counts. See People v. Price (1986) 184 CA3d 1405. To

L-21

1    increase the sentence a lawful sentence upon remand for resenten-

2    cing violates both state and federal safeguards against double

3    jeopardy and exudes the odor of prosecutorial/judicial vindict-

4    iveness by additionally punishing the defendant for exercising

5    his right to appeal from a judgment of criminal conviction.

6    See North **Carolina v. Pearce** (1969) 395 US 711, also **Blackledge**

7    v. Perry (1974) 417 US 21.

8        For controlling state authority this court need go no

9    further than the holding of the California Supreme Court as

10   held in People **v. Hanson** (2000) 23 **Cal.4th** 355 which matches

11   the facts and points argued herein on all four points of the

12   legal compass. The defendant in **Hanson** was originally ordered

13   to pay a $1,000.00 Restitution Fine. On appeal the case was

14   reversed in part and remanded for resentencing. Upon resentenc-

15   ing the trial court increased the Restitution Fine to the amount

16   of $10,000.00. The defendant appealed and the California Supreme

17   Court ruled that a Restitution fine is "punishment" for double

18   jeopardy purposes and that an increase in statutorily mandated

19   restitution fines upon resentencing violates prohibitions in

20   the State Constitution against double jeopardy.

21       The **Hanson** facts are indistinguishable from the facts of

22   this case. As such the sentencing court's increase of the defend-

23   ant's original $100.00 Restitution Fine upon remand for

24   resentencing violates double jeopardy and is therefore unauthor-

25   ized. This court is compelled to correct this error and modify

26   the judgment in this matter.

27       Further, the defendant respectfully requests this Honorable

L-22

1    Court to review the judgment of this case for any other

2    sentencing errors which may have occurred.

3        Lastly, the defendant respectfully brings to the court's

4    attention that he did raise this issue in a petition for writ

5    of habeas corpus previously presented to this court. However,

6    in an opinion dated March 12, 2007 the court ruled on the other

7    claims presented in the petition but failed to address the matter

8    presented herein. The defendant respectfully points out to the

9    court that it is the duty of the court to correct an unlawful

10    sentence when ever the matter comes to the attention of the

11    court. See In re Sandel, supra, at pp. 417-419; People v.

12    Chagolla, supra, at p. 434. See also **People v. Mitchell (2001)**

13    **26 C4th 181, 187.**

CONCLUSION

15        For the reasons set forth herein defendant respectfully

16    prays this Honorable Court to correct the sentencing error by

17    modifying judgment to reflect the original $100.00 Restitution

18    Fine imposed in this case and any other errors in judgment the

19    court may determine.

20    Dated: _____             Respectfully submitted,

22                      _____

                      Harry Eldridge, Defendant,
                      In Pro Per.

L-23

EXHIBIT "E"

1

2

3                                   F I L E D

4                               JAN 2·9 2008

5                               KIRI TORRE
                              Chief Executive Officer
                        Superior Court of CA County of Santa Clara
                        BY _____ DEPUTY

6

7                  SUPERIOR COURT OF CALIFORNIA

8                    COUNTY OF SANTA CLARA

9

10 In re                     )

11                        )  No. 142464

12   HARRY ELDRIDGE,       )  O R D E R

13 Ex Parte              )

14

15      Mr. ELDRIDGE has submitted to this Court a "Motion Requesting

16 Correction of Sentence" in which he seeks to vacate, modify,

17 'correct,' reduce, waive, reconsider, or dispose of, his restitution

18 fine/order. All requested relief or action is DENIED.

19      Petitioner's claim of error should have been presented to the

20 Sixth District in either a direct appeal or in Petitioner's most

21 recent habeas corpus petition H031358. The matter may not now be

22 considered by the Superior Court.

23

24 DATED: _____, 2008                           

25                          DIANE NORTHWAY
                        JUDGE OF THE SUPERIOR COURT

26 cc:   Petitioner
       District Attorney

27        Research(12-31A)
       CJIC

28

L -25

EXHIBIT F

HARRY ELDRIDGE H-06424
MULE CREEK STATE PRISON
P.O. BOX 409060, C-13-244-L
Ione, CA 95460

IN THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA

IN AND FOR THE SIXTH APPELLATE DISTRICT

HARRY ELDRIDGE,
      Petitioner,

     v.

SUPERIOR COURT OF CALIFORNIA
FOR THE COUNTY OF SANTA CLARA,
      Respondent Court.

PEOPLE OF CALIFORNIA,
      Real Party.
_____/

DOCKET NO. _____

**PETITION FOR WRIT OF MANDATE**

Superior Court No. 142464

Court of Appeal No.
  Direct Appeal: H008751
  Habeas Corpus: H031358

TO:  THE HONORABLE PRESIDING JUSTICE AND ASSOCIATE JUSTICES
    OF THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA, SIXTH
    APPELLATE DISTRICT:

    PETITIONER, Harry Eldridge, hereby petitions this Honorable

Court for a writ of mandate directed to the Superior Court of

California, in and for the County of Santa Clara, and by this

verified petition represents that:

I

    The facts relevant to the matters presented herein are:

    On January 4, 1991 an Amended Information was filed in

case number 142464 in the Santa Clara County Superior Court

1.

L - 27

charging Petitioner with several counts of forcible rape, oral
copulation and assault. (Penal Code Sections 261(2), 288a(C),
and 245(a)(1)) Petitioner began trial on April 18, 1991. On
May 3, the jury returned a verdict of acquital on several counts
and guilty on the remaining counts. On July 26, 1991 Petitioner
was sentenced to an aggregate term of 90 years and ordered to
pay a Restitution Fine in the amount of $100.00.

An appeal followed in the Sixth Appellate District.
(H008751) That Court affirmed the conviction but remanded for
resentencing; the trial court erred in the sentencing of certain
of the sexual assault counts pursuant to Penal Code Section
667.6(d).

On March 4, 1994, in the trial court, Petitioner was re-
sentenced to an aggregate term of 84 years and the Restitution
Fine was increased from $100.00 to $1,000.00.

A second appeal was denied in full, with the Petition to
the California Supreme Court for Review being denied on March,
3, 1995.

II

In December of 2006 Petitioner filed a Petition For Writ
Of Habeas Corpus in the trial court raising several claims
of sentencing errors (Claims I-IV) and Ineffective assistance
of trial and appellate counsels (Claims V and VI).

Although the arguments presented in Claims I and II of
the petition pre-date the decision of the United States Supreme
Courts decision in Cunningham v. California 549 U.S. _____ (2007),
166 L.Ed.2d 856, 127 S.Ct. 856 (decided January 22, 2007),

L-28

1  the thrust of the argument was essentially the same. However,

2  in Claim III of the writ petition (and material to this writ

3  petition) Petitioner alleged:

4          UPON RESENTENCING THE TRIAL COURT EXCEEDED
        IT'S JURISDICTION, AND VIOLATED PETITIONER'S

5          STATE AND FEDERAL RIGHT TO DUE PROCESS OF
        THE LAW AND TO NOT BE PUT IN JEOPARDY FOR

6          THE SAME OFFENSE.

7      The trial court denied the petition stating that petitioner

8  was not entitled to relief under Cunningham because petitioner's

9  case was final prior to Cunningham's date of determination.

10  This order of denial, dated March 12, 2007 is appended hereto

11  and identified as Petitioner's exhibit A. The order does not

12  address Claim III of the Habeas Corpus petition.

13      Subsequently Petitioner filed a Petition For Writ Of Habeas

14  Corpus in the California Court of Appeal, Sixth Appellate

15  District (Docket No. H031358) raising the same claims as pres-

16  ented below. The petition was denied on May 2, 2007. This order

17  of denial is appended hereto and identified as Petitioner's

18  exhibit B. The same claims were presented the the California

19  Supreme Court in a Petition For Writ Of Habeas Corpus (S152690)

20  and was denied on October 10 2007. Order of denial is attached

21  and identified as Petitioner's exhibit C.

22      No state writ petition has been procedurally bared as

23  untimely.

24                    III

25      On December 31, 2007, in the trial court, Petitioner filed

26  a Notice and Motion Requesting Correction of Sentence. A true

27  and correct copy of this motion is appended hereto and identif-

3.

L-29

1 | ied as Petitioner's exhibit D. This motion requested the
2 | correction of an unlawful sentence, which can be corrected at
3 | any time,: the unlawful increase of Petitioner's Restitution
4 | Fine From $100.00 to $1,000.00 upon resentencing. This motion
5 | was denied on January 29, 2008. In it's order of denial (appended
6 | hereto and identified as Petitioner's exhibit E) the Court stated
7 | that the Claims should have been presented on direct appeal
8 | or in a writ petition previously filed in this court in case
9 | number H031358. (See exhibit E)

10 | As presented in Petitioner's previous pleadings and
11 | argued below the increase in Petitioner's Restitution fine from
12 | $100.00 to $1,000.00 upon resentencing is unlawful and the trial
13 | court has a duty to correct an unlawful sentence at anytime
14 | the matter is presented to it. The controlling law in this matter
15 | is clear and unambiguous. The Respondent Court has failed to
16 | perform a duty the law requires it to perform. Therefore,
17 | Petitioner, Harry Eldridge, seeks and order from this Honorable
18 | Court to compel the Respondent Court to perform it's duty and
19 | correct sentencing errors in this case, as addressed herein.

20 | IV

21 | The parties directly effected by the present proceedings
22 | described and addressed herein are petitioner, Harry Eldridge;
23 | the Respondent Court, Superior Court of the State of California
24 | in and for the County of Santa Clara; and the party directly
25 | effected as real party in interest is the People of the State
26 | of California

27 | All proceedings about which this petition is concerned

4.

L-30

1 | have occurred within the territorial jurisdiction of the Respond-
2 | ent Court and the California Court of Appeal, Sixth Appellate
3 | District.

V

5 | No other petition for writ of mandate has been made by
6 | or on behalf of this petitioner relating to this matter.

VI

8 | Petitioner has no other plain, speedy or adequate remedy
9 | at law save by this petition for writ of mandate.

VII

11 | Petitioner hereby requests that this Court take judicial
12 | notice of the record on appeal and the briefs filed and lodged
13 | exhibits in Case No. H031358 (Evidence Code Sections 452, 459).
14 | Reproducing the record for use in connection with this petition
15 | would entail unnecessary expense since this court and counsel
16 | for Respondent and Respondent Court already have a copy of the
17 | record and all pleadings relevant to the matters addressed here-
18 | in. Petitioner further requests this Court take judicial notice
19 | of all documents appended hereto as exhibits (Evidence Code
20 | Section 450, et seq.) since all of the documents appended hereto
21 | are court records, orders, and relevant pleading filed in this
22 | matter.

24 | **WHEREFORE, Petitioner prays that:**

25 | 1.    This Court issue a preemtory writ of mandate directing
26 | the Respondent Court to perform its duty by correcting Petition-
27 | er's unlawful sentence as addressed herein.

5.

∠ -31

Respectfully submitted:

Dated: _____

_____
Harry Eldridge, In Pro Per


## **VERIFICATION**

I, Harry Eldridge, declare as follows:

I am the named petitioner in this cause of action. All facts alleged in the above petition and attached exhibits and argument and authorities, not supported otherwise by citation to the record or to other documents are true and correct to my own personal knowledge.

I declare under penalty of perjury the foregoing is true and correct and that this declaration was executed at Mule Creek State Prison, located at Ione California on February 7, 2008 by:

_____
Harry Eldridge, Declarant

6.

L-32

1

## ARGUMENT AND AUTHORITIES

2       In Payne v. Superior Court (1976) 17 Cal.3d 908, 925, the

3   California Supreme Court held that a writ of mandate lies gener-

4   ally to compel a court or its officer to perform an act that

5   the law imposes as a duty when no plain, speedy and adequate

6   remedy at law is available. (See also California Code of Civil

7   Procedure, §§ 1085-1086) A writ of mandate is ordinarily not

8   available unless it is shown that the Respondent Court has

9    refused to perform a clear duty, unmixed with discretionary

10  power or the exercise of judgment. See Talaferro v. Locke (1960)

11  182 CA2d 752, 755. Mandate lies to set aside an order or judgment

12  that exceeds or abuses the discretion vested in the court. See:

13  Andrews v. Superior Court (1946) 29 C2d 208; Gray v. Superior

14  Court (2005) 125 CA4th 629, 641. Mandate is appropriate to

15  compel a court to exercise discretion and to do so under a

16  proper interpretation of the applicable law. See Anderson v.

17  Phillips (1975) 13 C3d 733.

18       When a sentence is unauthorized by law it may be corrected

19  at any time even without an objection. See People v. Chagolla

20  (1983) 144 CA3d 422, 433; People v. Scott (1994) 9 C4th 331,

21  354 fn17. If the sentencing court refuses to correct an illegal

22  sentence remedy lies in a petition for writ of mandate to the

23  appellate court. See People v. Superior Court (Oliver) (1933)

24  135 CA 562.

25       Petitioner hereby incorporates by reference the facts and

26  arguments presented in attached exhibit D and Claim III of the

27  Petition For Writ of Habeas Corpus on file in the Respondent

1  Court in Case No 142464 and the California Court of Appeal,

2  Sixth Appellate District in Case No. H031358 in support of this

3  petiton.

4      This is not a complex matter. Petitioner appealed his

5  conviction. The case was sent back to the sentencing court for

6  resentencing on matters not effecting the validity of the

7  original $100.00 Restitution Fine, which was lawful at the time

8  of original sentencing. At resentencing the court increased

9  the Restitution Fine to $1,000.00. This is unlawful as held

10  by the California Supreme Court in **People v. Henderson (1963)**

11  **60 Cal.2d 482, 495-497**, (the Henderson Rule), as was applied

12  to a case which matches the facts of this case at all four points

13  of the compass in **People v. Hanson (2000) 23 Cal.4th 355**. To

14  increase a Restitution Fine upon resentencing violates due

15  process and double jeopardy. See Hanson, supra.

16      This error in sentencing has been brought to the attention

17  of the trial court who has refused to act by correcting an

18  unlawful sentence. See exhibits A and E. Therefore Petitioner

19  has no other remedy save through this Court's issuance of Mandate

20  to compel the Respondent Court to perform the duty of correcting

21  Petitioner's sentence.

22      For all the reasons set forth herein the remedy prayed

23  for must be granted.

24  Dated: _____          Respectfully Submitted by:

25

26                                _____
                                  Harry Eldridge, In Pro Per

27

∠ - 39